1   MICHAEL J. BETTINGER (State Bar No. 122196)
    mike.bettinger@klgates.com
2   RACHEL R. DAVIDSON (State Bar No. 215517)
    rachel.davidson@klgates.com
3   JAS S. DHILLON (State Bar No. 252842)
    jas.dhillon@klgates.com
4   K&L Gates LLP
    Four Embarcadero Center, Suite 1200
5   San Francisco, CA 94111
    Telephone: (415) 882-8200
6   Facsimile: (415) 882-8220

7   J. MICHAEL KEYES (STATE BAR NO. 262281)
    mike.keyes@klgates.com
8   K&L Gates LLP
    618 West Riverside Avenue, Suite 300
9   Spokane WA  99201-0602
    Phone: (509) 624-2100
10  Facsimile:  (509) 456-0146

11  Attorneys for Defendant
    SAND HILL ADVISORS LLC
12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15

16  SAND HILL ADVISORS, LLC, a Delaware          **Case No. CV-08-5016-SBA**
    limited liability company,
17
                                                 **NOTICE OF MOTION AND**
18                            Plaintiff,          **MEMORANDUM OF LAW IN**
                                                 **SUPPORT OF DEFENDANT SAND**
19        v.                                      **HILL ADVISORS LLC'S MOTION**
                                                 **FOR SUMMARY JUDGMENT**
19  SAND HILL ADVISORS LLC, a California
20  limited liability company,                   **Trial Date: February 22, 2009**

21                            Defendant.          Date: February 23, 2009
                                                 Time: 1:00 p.m.
22                                               Courtroom: 3 (3rd Floor)
                                                 Judge: Hon. Saundra Brown Armstrong
23

24

25

26

27

28

TABLE OF CONTENTS

Page

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................1

II.  FACTUAL BACKGROUND ...................................................................................................3

     A.   The Parties..................................................................................................................3

          1.   Defendant purchases, owns, sells, manages and leases commercial real estate for its own account ......................................................................3

          2.   Plaintiff is a wealth management business and registered investment advisory firm ..............................................................................4

     B.   Procedural History .....................................................................................................6

III. LAW AND ARGUMENT ........................................................................................................7

     A.   Defendant is Entitled to Summary Judgment Because Plaintiff Cannot Show That it Has a Protectable Service Mark or That an Appreciable Amount of Consumers Are Likely to be Confused .........................................................................7

     B.   Plaintiff Does Not Have a Protectable Mark Because "Sand Hill Advisors" is "Primarily Geographically Descriptive" and Plaintiff Has *No* Evidence of "Secondary Meaning." .................................................................................................7

          1.   The USPTO found—and the undisputed evidence confirms—that Plaintiff's alleged service mark "Sand Hill Advisors" is "primarily geographically descriptive." .....................................................................8

          2.   It is undisputed that the primary significance of the term "Sand Hill" is a geographic location in Menlo Park, California and Plaintiff chose "Sand Hill Advisors" to emphasize its location ......................................9

          3.   It is undisputed that for many years Plaintiff's services originated from Sand Hill Road and that Plaintiff is currently located in very close proximity to Sand Hill Road ............................................................10

          4.   It is undisputed that the consuming public associates Plaintiff's services as originating from the geographic location of Sand Hill Road and that Plaintiff chose "Sand Hill Advisors" to emphasize this connection ...................................................................................................10

          5.   The Plaintiff does not have a protectable service mark in "Sand Hill Advisors" because it cannot show that its alleged mark acquired "secondary meaning." ......................................................................................11

          6.   Plaintiff failed to conduct a consumer survey or provide any evidence showing that consumers associate Plaintiff's real estate investment services with Plaintiff ..............................................................................12

7.  Plaintiff has engaged in virtually no advertising under "Sand Hill Advisors," and does not do *any* advertising for its supposed "real estate investment services." .................................................. 13

8.  Plaintiff admits that it is unable to indicate the amount of "real estate-related services" that it has provided under its alleged mark "Sand Hill Advisors." .................................................. 15

9.  Plaintiff's use of "Sand Hill Advisors" has not been exclusive, but has competed for many years with companies using similar names for similar services .................................................. 15

C.  Even if Plaintiff *Could* Establish That "Sand Hill Advisors" is a Protectable Service Mark, it Cannot Show That Defendant's Use of the Mark is Likely to Cause Confusion Among an Appreciable Amount of Consumers .................................................. 16

1.  Plaintiff's supposed service mark is commercially weak because it exists in a "crowded field" of similar marks for investment-related services .................................................. 17

2.  The similarity between Plaintiff and Defendant's use of "Sand Hill Advisors" is not sufficient to create a triable issue of fact .................................................. 18

3.  Plaintiff's investment management business is not related to Defendant's commercial real-estate business .................................................. 19

4.  Plaintiff and Defendant do not use the same marketing channels .................................................. 21

5.  Plaintiff's customers are sophisticated and presumed to exercise a high degree of care in service choices .................................................. 22

6.  Plaintiff has failed to produce any meaningful evidence of actual confusion despite the fact that it has co-existed with Defendant in the same geographical location for approximately nine years .................................................. 23

7.  There is no evidence that Defendant intended to infringe Plaintiff's alleged mark .................................................. 24

8.  There is no likelihood of expansion .................................................. 25

IV.  CONCLUSION .................................................. 25

TABLE OF AUTHORITIES

Page

**Federal Cases**

*AMF Inc. v. Sleekcraft Boats,*
    599 F.2d 341 (9th Cir. 1979)...............................................................16, 19, 22

*Anstar Corp v. Domino's Pizza, Inc.,*
    615 F.2d 252 (5th Cir. 1980).............................................................................18

*Aromatique, Inc. v. Gold Seal, Inc.,*
    28 F.3d 863 (8th Cir. 1994)...............................................................................14

*Art Attacks Ink, LLC v. MGA Entertainment Inc.,*
    581 F.3d 1138 (9th Cir. 2009)...............................................................13, 14, 15

*Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,*
    718 F.2d 1201 (1st Cir. 1983) ...........................................................................20

*Brennan's Inc. v. Brennan,*
    512 F. Supp. 2d 559 (S.D. Miss. 2007) .............................................................24

*Brookfield Communications Inc. v. West Coast Entertainment Corp.,*
    174 F.3d 1036 (9th Cir. 1999)...........................................................................23

*Cairns v. Franklin Mint Co.,*
    24 F. Supp. 2d 1013 (C.D. Cal. 1998) ...............................................................12

*California Cooler, Inc. v. Loretto Winery, Ltd.,*
    774 F.2d 1451 (9th Cir. 1985).............................................................................7

*Carter-Wallace, Inc. v. Procter & Gamble Co.,*
    434 F.2d 794 (9th Cir. 1970).......................................................................11, 14

*Classic Foods Intern. Corp. v. Kettle Foods, Inc.,*
    468 F. Supp.2d 1181 (C.D. Cal. 2007) ..............................................................15

*Echo Drain v. Newsted,*
    307 F.Supp. 2d 1116 (C.D. Cal. 2003) ..............................................................23

*Eclipse Assocs. Ltd. v. Data Gen. Corp.,*
    894 F.2d 1114 (9th Cir. 1990)...........................................................................17

*Empire Nat'l Bank of Traverse City v. Empire of America, FSA,*
    559 F. Supp. 650 (W.D. Mich. 1983) ................................................................17

*Entrepreneur Media v. Smith,*
    279 F.3d 1135 (9th Cir. 2002).................................................................7, 16, 23

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,*
    826 F.2d 837 (9th Cir. 1987).............................................................................25

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ...................................................................................17

*HMH Publishing Co. v. Brincat*,
  504 F.2d 713 (9th Cir. 1974) .....................................................................................11

*International Jensen, Inc. v. Metrosound U.S.A., Inc.*,
  4 F.3d 819 (9th Cir. 1993) ..........................................................................................12

*Levi Strauss & Co. v. Blue Bell, Inc.*,
  778 F.2d 1352 (9th Cir. 1985) ..............................................................................11, 23

*Lindy Pen Co. v. Bic Pen Corp.*,
  982 F.2d 1400 (9th Cir. 1993) ...................................................................................24

*M2 Software, Inc., v. Madacy Entertainment*,
  421 F.3d 1073 (9th Cir. 2005) .......................................................................18, 19, 21

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*,
  2004 WL 833595 (N.D. Tex. Apr. 19, 2004) .............................................................19

*Mechanical Plastics Corp. v. Titan Technologies, Inc.*,
  823 F.Supp. 1137 (S.D.N.Y. 1993) ...........................................................................8, 9

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
  856 F.2d 1445 (9th Cir. 1988) ...................................................................................17

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
  331 F.Supp. 2d 1214 (C.D. Cal. 2004) .........................................................................8

*Oxford Industries, Inc., v. JBJ Fabrics Inc.*,
  6 U.S.P.Q.2d 1756 (S.D.N.Y 1984) ...........................................................................18

*PostX Corp. v. docSpace Co., Inc.*,
  80 F. Supp.2d. 1056 (N.D. Cal. 1999) .......................................................................17

*Safeway Stores, Inc. v. Safeway Ins. Co.*,
  657 F. Supp. 1307 (M.D. La. 1985) ...........................................................................18

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
  59 F.3d 902 (9th Cir. 1995) ...................................................................................11, 13

*Sioux v. First Nat'l Bank S.D.*,
  153 F.3d 885 (8th Cir. 1998) .....................................................................................22

*Surfvivor Media, Inc. v. Survivor Productions*,
  406 F.3d 625 (9th Cir. 2005) .................................................................................8, 25

*Switchmusic.com., Inc. v. U.S. Music Corp.*,
  416 F. Supp. 2d 812 (C.D. Cal. 2006) .......................................................................22

*Top Tobacco, L.P. v. N. Atl. Operation Co.*,
  2007 WL 118527 (N.D. Ill. Jan. 4, 2007), *aff'd* 509 F.3d 380 (7th Cir. 2007) ............18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Vision Sports, Inc. v. Melville Corp.,*
  888 F.2d 609 (9th Cir. 1995)................................................................12

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.,*
  419 F.3d 925 (9th Cir. 2005)..................................................................7

**Federal Statutes**

15 U.S.C. § 1052(f) ..............................................................................15

**State Statutes**

Cal. Bus. & Prof. Code §§10130-10149..........................................5, 20

**Other Authorities**

*In re Cal. Pizza Kitchen Inc.,*
  10 USPQ2d 1704 (T.T.A.B. 1988)..........................................................8

*In re Carolina Apparel,*
  48 USPQ2d 1542 (T.T.A.B. 1998)..........................................................9

*In re Handler Fenton Ws., Inc.,*
  214 USPQ 848 (T.T.A.B. 1982).............................................................10

*In re Spirits of New Merced, LLC,*
  85 USPQ2d 1614 (T.T.A.B. 2007).........................................................10

*Local Trademarks, Inc. v. Handy Boys, Inc.,*
  16 USPQ2d 1156 (T.T.A.B. 1990).........................................................18

*Target Brands, Inc. v. Hughes,*
  85 USPQ2d 1676 (T.T.A.B. 2007).........................................................14

1

## **NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

      PLEASE TAKE NOTICE that on February 23, 2010 at 1:00 p.m. or as soon thereafter as the

4

parties may be heard, in the courtroom of the Honorable Saundra Brown Armstrong, Courtroom 3,

5

located at 1301 Clay Street, 3rd Floor, Oakland, CA 94612-5212, Defendant Sand Hill Advisors

6

LLC, a California limited liability company will, and hereby does move for Summary Judgment

7

against Plaintiff Sand Hill Advisors, LLC's, a Delaware limited liability company, Complaint for

8

Willful Service Mark Infringement.

9

      This Motion is based upon this Notice of Motion, the Memorandum of Points and

10

Authorities, the supporting Declarations of Rachel R. Davidson and Albert R. Hill, Jr. and any other

11

argument or evidence that may be presented in advance of or at any hearing of this Motion.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
**CERTIFICATION OF COMPLIANCE WITH COURT'S STANDING ORDER**

2      Pursuant to this Court's Standing Order, Defendant Sand Hill Advisors LLC ("Defendant")

3 certifies that it has complied with the Court's meet-and-confer requirements before filing this

4 Motion.

5
**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

6      This case presents a dispute between two completely different types of businesses over the

7 use of the term "Sand Hill Advisors."  Defendant has been purchasing, owning, selling, managing

8 and leasing commercial real estate in the Bay Area for its own account under the business name

9 "Sand Hill Advisors LLC" since April 1999.  Plaintiff has been providing wealth management

10 advice in the Bay Area under "Sand Hill Advisors" since December 1995.  After Defendant operated

11 in the same geographic location as Plaintiff for **more than nine** years, without Plaintiff once

12 complaining, Plaintiff initiated this action claiming that consumers are "likely to be confused" by

13 Defendant's use of "Sand Hill Advisors" as part of its business name, even though Plaintiff admits

14 that it cannot identify even a **single** consumer or potential consumer who has expressed any sort of

15 confusion.

16      Plaintiff's Complaint for service mark infringement rests on two extraordinary, but fatally

17 flawed propositions.  The first is that Plaintiff supposedly owns the exclusive right to use the

18 geographically descriptive term "Sand Hill Advisors" as a service mark.  The second is that Plaintiff

19 can somehow show under the Ninth Circuit test for service mark infringement (the "*Sleekcraft*"

20 factors) that after more than nine years of co-existing side-by-side with Defendant, without Plaintiff

21 receiving any reports of confusion, consumers now are likely to confuse Plaintiff and Defendant's

22 businesses.  Neither of these propositions is factually or legally tenable.  The undisputed facts in this

23 case highlight overwhelming legal and factual obstacles that preclude Plaintiff's claim for relief.

24 The most significant obstacles are as follows:

25      (1) Plaintiff does not have a protectable service mark.  The United States Patent and

26 Trademark Office (the "USPTO") has already rejected Plaintiff's service mark application for "Sand

27 Hill Advisors," finding that it was primarily geographically descriptive of the location Sand Hill

28

---

Road in Menlo Park, California.   This finding is confirmed by the undisputed evidence and Plaintiff's own admissions in this case.

(2) Plaintiff cannot show that its alleged mark "Sand Hill Advisors" had acquired "secondary meaning" *as of the date Defendant first began using the allegedly infringing mark in April 1999*. And, it cannot do so now.   Plaintiff has not conducted a consumer survey and has not identified a single consumer that will testify that "Sand Hill Advisors" was or is associated solely with Plaintiff. Plaintiff has not provided evidence of any marketing or advertising expenditures for its purported "real estate investment services" it claims to provide to its clients; nor can it even identify any revenue attributable to those services.

(3) Plaintiff admits that its alleged "service mark" is weak.   In its response to the USPTO's rejection of its service mark application, Plaintiff was forced to take the unusual position that its alleged mark is diluted because there is extensive third-party use of similar marks for similar services.   Indeed, the undisputed evidence shows that the wealth management industry is flooded with numerous businesses that use "Sand Hill" in various forms and permutations.   Plaintiff's use of just another "Sand Hill" variant melds with the similar commercial uses by the rest of that crowd and dooms any claim that Plaintiff owns a distinctive mark.

(4) Plaintiff cannot show any overlap between its and Defendant's services, customers, or marketing channels.   Plaintiff concedes that Defendant is not a competitor; it has not lost a single customer to Defendant to date, and it cannot show any overlap in marketing channels, much less can it show that Defendant markets any services at all.

(5) Other than pure speculation, Plaintiff has absolutely no evidence that could possibly establish that Defendant selected the term "Sand Hill Advisors" as part of its business name, over nine years ago, because it wanted to trade off of Plaintiff's self-proclaimed "goodwill."

The deficiencies in Plaintiff's case are insurmountable.   Since the undisputed facts demonstrate that Plaintiff cannot, on any level, raise a triable issue of fact, Defendant is entitled to summary judgment.

## II.    FACTUAL BACKGROUND

**A.    The Parties.**

    1.    Defendant purchases, owns, sells, manages and leases commercial real estate for its own account.

Defendant is a California limited liability company, located in Los Altos, California. (Declaration of Albert Hill, ¶ 2 ("Hill Dec.")).  It was formed by two business partners, Bert Sandell and Al Hill, on April 27, 1999, and was registered with the California Secretary of State under the business name "Sand Hill Advisors LLC" on that date.  (*Id.*).  Since its formation, Messrs. Sandell and Hill have been Defendant's only members.  (*Id.*).  The term "Sand Hill" in Defendant's business name was derived by combining the first four letters of Mr. Sandell's last name and Mr. Hill's last name, "Sand" and "Hill."  (*Id.*).

For its business, Defendant purchases, owns, sells, manages and leases commercial real estate in the Bay Area, primarily industrial and office space, for its own investment purposes.  (*Id.* at ¶ 3).  In this regard, Defendant locates commercial property it is interested in buying.  Upon purchase of a particular piece of real estate, Defendant typically assigns it to another limited liability company or companies owned by Messrs. Sandell and Hill.  (*Id.*).  Defendant serves as the sole contact for those interested in selling commercial real estate or leasing available properties that Messrs. Sandell and Hill independently own.  (*Id.*).

Defendant does not provide services to the general public.  (*Id.* at ¶ 4).  It never has sold any products, or provided capital, investment, financial or management expertise or advice to the general public, or anyone else.  (*Id.*).  It does not provide advice or counseling related to real estate investments or the real estate market to third-parties.  (*Id.*).  Nor has Defendant ever located, acquired, assigned, or purchased any form of real estate for any member of the public.  (*Id.*).  Defendant does not advertise any services to the public.  (*Id.*).  Simply put, Defendant merely purchases, owns, manages, leases and sells commercial property for its own account.

Defendant works with third-party commercial real estate brokers.  (*Id.* at ¶ 5).  Defendant relies on these real estate brokers to contact it when commercial industrial and office properties are available for sale, or when there are parties interested in purchasing or leasing Defendant's

commercial industrial or office real estate. (*Id.*). Defendant has been doing business with Bay Area commercial real estate brokers for approximately ten years under the Sand Hill Advisors LLC business name. (*Id.* at ¶¶ 2, 13). Although it has been using this name for nearly ten years to date, Defendant is only aware of receiving a few misdirected phone calls and a single package which were intended for Plaintiff. (*Id.* at ¶ 13).

> 2.   Plaintiff is a wealth management business and registered investment advisory firm.

Plaintiff is a Delaware limited liability company "wealth management" firm located in Palo Alto, California. Plaintiff began using "Sand Hill Advisors" in connection with its business in December 1995. (Exhibit ("Ex.") A to the Declaration of Rachel R. Davidson ("Davidson Dec."), McCaffrey Dep. at 62:24-63:5). The term "Sand Hill" in Plaintiff's name refers to "Sand Hill Road," which is located in Menlo Park. (Ex. B to Davidson Dec., Williams Dep. at 27:10-23; Ex. C to Davidson Dec., Conway Dep. at 23:16-24:14).[1] "Sand Hill Road" and the surrounding area is particularly well-known for the high concentration of venture capital firms located in the vicinity. (Ex. A to Davidson Dec., McCaffrey Dep. at 132:19-133:8; *see also* Ex. D to Davidson Dec.). Sand Hill Road's significance as a symbol of private equity in the United States is often compared to that of Wall Street in the stock market. (*Id.*). Because Plaintiff's business was initially located on Sand Hill Road, and because of the "cachet" associated with that location, Plaintiff wanted to "trumpet" the fact that its name included the "Sand Hill" moniker. (Ex. C to Davidson Dec., Conway Dep. at 23:16-24:14; Ex. B to Davidson Dec., Williams Dep. at 27:10-23). Plaintiff, however, is not the only investment management firm that uses the term "Sand Hill" in its name. Scores of other companies who are located on Sand Hill Road or in the vicinity use the term "Sand Hill" in their name. (Ex. E to Davidson Dec.). In fact, Plaintiff admits that it has been confused with other investment service companies using "Sand Hill" as part of their business names. (Ex. A to Davidson

---

[1] Plaintiff designated its Chief Executive Officer, James McCaffrey, and President, Jane Williams, as its 30(b)(6) witnesses. Gary Conway was one of Plaintiff's founders and was its Chief Executive Officer from 1995-2004. He served as a member on Plaintiff's Board of Directors from 1995-2009. (Ex. C to Davidson Dec., Conway Dep. at 14:19-17:6).

1   Dec., McCaffrey Dep. at 167:23-169:24; Ex. B to Davidson Dec., Williams Dep. at 34:12-35:6;

2   36:18-37:11).

3         Plaintiff offers investment planning, retirement and estate planning, philanthropic strategies,

4   divorce financial consulting and solutions for "women in transition."  (Ex. A to Davidson Dec.,

5   McCaffrey Dep. at 36:1-43:19; Ex. C to Davidson Dec., Conway Dep. at 24:15-26:20; *see also* Ex. L

6   to Davidson Dec.).  It is a registered Investment Advisory firm with the U.S. Securities and

7   Exchange Commission ("SEC").  (Ex. A to Davidson Dec., McCaffrey Dep. at 44:23-45:23).

8   Plaintiff provides services to "high-net-worth" clients with assets over two and half million dollars.

9   (*Id.* at 37:11-39:3).  It has approximately one hundred fifty (150) clients, 60% of whom have been

10  with the company for about fifteen years.  (*Id.* at 55:3-56:15).  Approximately 95% of Plaintiff's

11  clients are based on referrals from existing clients, board and investment committee members from

12  the institutions it works with, and family law estate planning.  (*Id.* at 54:16-55:5).  Plaintiff's

13  principal competitors are Bingham Osborne Scarborough, Baker Street, Kochis Fitz, Wetherby Asset

14  Management and Merrill Lynch.  (*Id.* at 148:20-149:2).  These competitors, like Plaintiff, are wealth

15  advisory firms.  (*Id.* at 35:11-18).

16        Although Plaintiff claims that it offers "real estate investment services," (Complaint, Dkt.

17  No. 1, ¶ 8) it does not purchase, own, sell, manage or lease commercial real estate as part of its

18  business service. (Ex. A to Davidson Dec., McCaffrey Dep. at 51:6-52:14; Ex. C to Davidson Dec.,

19  Conway Dep. at 31:1-32:7).  In fact, under California law, it would be illegal for Plaintiff to provide

20  any such services to a third-party, unless it has a real estate license, which it does not.  Cal. Bus. &

21  Prof. Code §§10130-10149; (Ex. A to Davidson Dec., McCaffrey Dep. at 50:10-22; Ex. B. to

22  Davidson Dec., Williams Dep. at 11:23-25).  Plaintiff does not work with real estate brokers and it

23  never has invested in commercial or industrial real estate for any third-party or for its own account.

24  (Ex. A to Davidson Dec., McCaffrey Dep. at 50:10-52:14).  In fact, Plaintiff is unable to determine

25  any amount of annual revenue that is attributable to the "real estate investment advice" it claims it

26  provides to its clients.  (*Id.* at 50:19-51:5; Ex. B to Davidson Dec., Williams Dep. at 41:17-45:5).

27

28

---

1   Nor does Plaintiff advertise any of the "real estate investments services" it purports to offer.  (*Id.* at

2   40:18-44:24).

3       **B.**       **Procedural History.**

4       On November 4, 2008, Plaintiff filed the instant case for "willful" service mark infringement.

5   It did not file this case because of any legitimate concern regarding potential "confusion" in the

6   marketplace.  (Ex. A to Davidson Dec., McCaffrey Dep. at 114:23-117:25; 212:7-14; *see also*

7   Complaint, Dkt. No. 1).  Instead, Plaintiff's real goal behind this lawsuit was to register as a

8   California limited liability company, which Plaintiff could not do in light of Defendant's 1999

9   registration with the California Secretary of State.  (Ex. A to Davidson Dec., McCaffrey Dep. at

10  212:7-10) (Q. Wasn't it true, though, you filed this lawsuit because you want the Sand Hill Advisors,

11  LLC, business name? A. Yes.).  In fact, one of Plaintiff's founders did not know that Plaintiff's case

12  involved a claim for service mark infringement.  (Ex. C to Davidson Dec., Conway Dep. at 82:24-

13  83:11; 75:3-77:5).  It was not until after Plaintiff converted into a limited liability company and

14  changed its name from Sand Hill Advisors, Inc. to Sand Hill Advisors, LLC in the State of Delaware

15  in November 2007,[2] that Plaintiff alleged that Defendant had been willfully infringing its "service

16  mark" for the previous nine years.  (Ex. A to Davidson Dec., McCaffrey Dep. 67:24-68:3; 130:16-

17  132:3).  Plaintiff admits that since its conversion into a limited liability company in November 2007,

18  it has been transacting business in California without being properly registered with the California

19  Secretary of State.  (*Id.* at 114:23-116:12).

20      On November 17, 2008—thirteen days *after* it filed its lawsuit against Defendant, and almost

21  fifteen years *after* it first started doing business as "Sand Hill Advisors" in 1995, Plaintiff applied for

22  a federal service mark for "Sand Hill Advisors."  On September 3, 2009, the USPTO rejected

23  Plaintiff's application on the grounds that its alleged mark "Sand Hill Advisors" was "primarily

24  geographically descriptive."  (*See* Ex. F to Davidson Dec.).

25  _____

26  [2] In November 2007, Plaintiff bought back a percentage of its company from its parent company
    Boston Private Financial Holdings, a leading multi-bank holding company located in Boston,
    Massachusetts.  (Ex. A to Davidson Dec., McCaffrey Dep. at 67:24-68:13; 82:16-84:17).  As part of
27  the purchase transaction, Plaintiff's predecessor, Sand Hill Advisors, Inc., converted from a
    Delaware corporation into a Delaware limited liability company, maintaining its principal place of
28  business in Palo Alto, California.  (*See* Complaint, Dkt. No. 1, ¶ 7).

1    ## III.    LAW AND ARGUMENT

2    **A.    Defendant is Entitled to Summary Judgment Because Plaintiff Cannot Show**
      **That it Has a Protectable Service Mark or That an Appreciable Amount of**
3    **Consumers Are Likely to be Confused.**

4         For two independent and powerful reasons, Defendant is entitled to summary judgment on

5    Plaintiff's claim for service mark infringement.  First, Plaintiff has the burden to establish as a

6    threshold matter that it, in fact, owns an enforceable service mark.  The undisputed evidence shows

7    that Plaintiff failed to meet this burden.  For this reason alone, Defendant is entitled to judgment as a

8    matter of law.  Second, even assuming Plaintiff could somehow establish that it has a valid service

9    mark, it must set forth credible evidence that an "appreciable amount" of consumers are likely to be

10   confused by Defendant's use of the term "Sand Hill Advisors."  *Entrepreneur Media v. Smith*, 279

11   F.3d 1135, 1151 (9th Cir. 2002).  Plaintiff has failed to identify any likelihood of confusion

12   whatsoever—let alone an "appreciable amount" of confusion.  For this reason as well, Defendant is

13   entitled to summary judgment.

14   **B.    Plaintiff Does Not Have a Protectable Mark Because "Sand Hill Advisors" is**
      **"Primarily Geographically Descriptive" and Plaintiff Has *No* Evidence of**
15   **"Secondary Meaning."**

16

17        The first step in any unregistered service mark infringement case under the Lanham Act

18   requires Plaintiff to establish that its unregistered service mark is "distinctive."  *Yellow Cab Co. of*

19   *Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005).  In order for an

20   unregistered service mark to be distinctive, Plaintiff must establish either that: (i) "Sand Hill

21   Advisors" is "inherently distinctive," i.e., intrinsically capable of identifying its source, or (ii) that

22   "Sand Hill Advisors" has "acquired distinctiveness" i.e., the relevant portion of the consuming

23   public has come to associate "Sand Hill Advisors" with Plaintiff's services.  *California Cooler, Inc.*

24   *v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454-55 (9th Cir. 1985).  If a claimed service mark is not

25   "distinctive" it cannot function as a service mark as a matter of law.  Professor McCarthy has

26   succinctly put it, "[n]o distinctiveness—no mark."    2 J. Thomas McCarthy, *McCarthy on*

27

28

1   *Trademarks and Unfair Competition*, § 11:2, 11-5 (4th ed. 2009).  Plaintiff cannot meet its burden of

2   establishing either type of distinctiveness.

3         1.   <u>The USPTO found—and the undisputed evidence confirms—that Plaintiff's alleged service mark "Sand Hill Advisors" is "primarily geographically descriptive."</u>

4

5         Marks that are "arbitrary" ("Camel" for cigarettes), "fanciful" ("Kodak" for film), or

6   "suggestive" ("Tide" for laundry detergent) are considered "inherently distinctive," and thus,

7   protectable marks under the Lanham Act.  *See, e.g.*, *Moose Creek, Inc. v. Abercrombie & Fitch Co*.,

8   331 F.Supp. 2d 1214, 1222 (C.D. Cal. 2004).  By contrast, a mark that is merely "descriptive" is

9   only protectable if it has acquired what is known as "secondary meaning."  *Id.*  A service mark is

10  "descriptive" if it describes the nature of the Plaintiff's services.  *Surfvivor Media, Inc. v. Survivor*

11  *Productions*, 406 F.3d 625, 632 (9th Cir. 2005).  A service mark also is descriptive if it is "primarily

12  geographically descriptive" of Plaintiff's services.  *In re Cal. Pizza Kitchen Inc*., 10 U.S.P.Q.2d

13  1704, 1706 (T.T.A.B. 1988) (holding CALIFORNIA PIZZA KITCHEN primarily geographically

14  descriptive of restaurant services rendered in California).   A mark is considered "primarily

15  geographically descriptive" when: (1) the primary significance of the mark is a generally known

16  geographic place or location; (2) the services provided by plaintiff originate in the geographic place

17  identified in the mark; and (3) consumers would likely make a "services-place" association; that is,

18  purchasers would likely believe that the services originate in the geographic place identified in the

19  mark. *Id.*

20        The USPTO has already found that "Sand Hill Advisors" is a primarily geographically

21  descriptive mark.  As a result, it rejected Plaintiff's service mark application for "Sand Hill

22  Advisors."  (*See* Ex. F to Davidson Dec.).  The undisputed evidence in this case dictates the same

23  conclusion—Plaintiff's alleged mark is "primarily geographically descriptive."  *Mechanical Plastics*

24  *Corp. v. Titan Technologies, Inc.*, 823 F.Supp. 1137, 1149 (S.D.N.Y. 1993) (noting that "[t]his Court

25  shows deference to the *factual* findings of the United States Patent and Trademark Office

26  examiners.") (emphasis in original).

27

28

---

2.   It is undisputed that the primary significance of the term "Sand Hill" is a geographic location in Menlo Park, California and Plaintiff chose "Sand Hill Advisors" to emphasize its location.

The term "Sand Hill" is the name for a stretch of road located between Stanford University and Silicon Valley in Menlo Park, California.  "Sand Hill Road" is a well known location, and is recognized by members of the public as a financial Mecca in the United States because a high concentration of venture capital and financial firms are located in the geographic vicinity.  (Ex. A to Davidson Dec., McCaffrey Dep. at 132:19-133:8; *see also* Ex. D to Davidson Dec.).   In fact, Plaintiff's founders—Mr. Gary Conway and Ms. Jane Williams—both testified that Plaintiff selected "Sand Hill Advisors" because of its geographic significance.  For example, Mr. Conway described the rationale behind the decision to adopt "Sand Hill Advisors" as follows: "[W]e were located on Sand Hill Road, 3000 Sand Hill.  And so that was our address, but we felt it was an address that we wanted to trumpet."  (Ex. C to Davidson Dec., Conway Dep. at 24:7-14).  He further testified that Plaintiff's geographic location on Sand Hill Road "was very much part and parcel" to Plaintiff's decision to adopt "Sand Hill Advisors."  (*Id.*).  Ms. Williams similarly confirmed the geographic significance of the term "Sand Hill."  She testified, among other things, that "Sand Hill Advisors" was adopted because "[w]e had been located at Sand Hill Road and actually were a very active part of that community around that area.  We lived in that area.  We worked in that area.  And we looked at other firms that made references to such geographies, but also were referring to a culture and community in a way that we thought was attractive.  And we thought we would go that direction."  (Ex. B to Davidson Dec., Williams Dep. at 27:10-23).  Based on this testimony, Plaintiff cannot credibly dispute that the term "Sand Hill" describes the well-known road in Menlo Park and that it adopted "Sand Hill Advisors" because of its geographic significance.[3]

---

[3] The fact that Plaintiff added on the descriptive term "Advisors" to the geographic location "Sand Hill" does not alter the significance of the mark as being primarily geographic.  *In re Carolina Apparel*, 48 USPQ2d 1542 (T.T.A.B. 1998).  (*See also*, Ex. F to Davidson Dec., September 3, 2009 USPTO's Office Action, SHACA725-26).

1
2

3.   It is undisputed that for many years Plaintiff's services originated from Sand Hill Road and that Plaintiff is currently located in very close proximity to Sand Hill Road.

3

4   A service "originates" from the geographic location in the mark if the services are provided

5   in that location or in close proximity thereto.  *See, e.g.*, *In re Spirits of New Merced, LLC*, 85

6   USPQ2d 1614, 1621 (T.T.A.B. 2007) (holding YOSEMITE BEER primarily geographically

7   descriptive of beer produced in a city "located near YOSEMITE").  Here, this factor is easily met.

8   In 1995, Plaintiff changed its name from "Conway, Williams and Foster, Inc." to "Sand Hill

9   Advisors, Inc." at which time Plaintiff was located on Sand Hill Road.  (Ex. C to Davidson Dec.,

10   Conway Dep. at 21:5-13).  The reason Plaintiff changed its name to "Sand Hill Advisors, Inc." was

11   because Plaintiff wanted to "trumpet" its Sand Hill Road location.  (*Id.* at 23:16-24:14).  In 2002,

12   Plaintiff changed locations to 245 Lytton Avenue, which is just a few blocks off of Sand Hill Road.

13   (Ex. A to Davidson Dec., McCaffrey Dep. at 132:4-20).  Based on these facts, it is undeniable that

14   Plaintiff's services originated directly from Sand Hill Road and that its services, to this day, are

15   provided in close proximity to this geographic location.

16
17

4.   It is undisputed that the consuming public associates Plaintiff's services as originating from the geographic location of Sand Hill Road and that Plaintiff chose "Sand Hill Advisors" to emphasize this connection.

18   A public association of the services with the geographic place is presumed if an applicant's

19   services originate in the place named in the mark and that location is neither obscure nor remote.  *In*

20   *re Handler Fenton Ws., Inc.*, 214 U.S.P.Q. 848, 849-50 (T.T.A.B. 1982).  Plaintiff admits that Sand

21   Hill Road is not an obscure or remote location.  (Ex. A to Davidson Dec., McCaffrey Dep. at

22   132:19-133:8).  Nor can it credibly dispute that its services initially originated from, and now are

23   offered in close proximity to Sand Hill Road.  (*Id.* at 132:4-20).  Accordingly, it is presumed that the

24   public associates Plaintiff's services as originating from its geographic location and Plaintiff has

25   presented no evidence to suggest otherwise.  *Handler Fenton*, 214 U.S.P.Q. at 849-50.  In fact, Mr.

26   Conway confirmed that Plaintiff chose "Sand Hill Advisors" precisely because of the services/place

27   association made by the public.  In explaining why Plaintiff changed its name to "Sand Hill Advisors

28

1  Inc.," Mr. Conway testified that: "*It captured where we were.  It captured the professional nature of*

2  *our business.  And it had the cache that we wanted.*"  (Ex. C to Davidson Dec., Conway Dep. at

3  23:24-24:6) (emphasis added).  For this factor too, it is undeniable that Plaintiff's services were

4  provided from, and are now in close proximity to, Sand Hill Road.

5      The USPTO ruled appropriately—the primary significance of "Sand Hill Advisors" is a

6  geographic location.  (*See* Ex. F to Davidson Dec., September 3, 2009 USPTO's Office Action,

7  SHACA725-26).  The same conclusion is appropriate in this case.

8      5.    The Plaintiff does not have a protectable service mark in "Sand Hill Advisors"
           because it cannot show that its alleged mark acquired "secondary meaning."

9

10     Because Plaintiff's purported service mark is primarily geographically descriptive, it is not,

11  as a matter of law, inherently distinctive.  Consequently, in order for "Sand Hill Advisors" to receive

12  protection as a valid service mark, Plaintiff must prove that the mark has acquired "secondary

13  meaning." *Self-Realization Fellowship Church v. Ananda Church of Self-Realization,* 59 F.3d 902,

14  910 (9th Cir. 1995) (a trademark that is descriptive and lacks secondary meaning is invalid).  A mark

15  acquires secondary meaning only where a *substantial segment* of consumers and potential customers

16  understand that the services in question come from a single source.  *Carter-Wallace, Inc. v. Procter*

17  *& Gamble Co*., 434 F.2d 794, 799 (9th Cir. 1970) (emphasis added).  The evidentiary burden for

18  establishing secondary meaning for a descriptive term is substantial.  *Seed Lighting Design Co., Ltd.,*

19  *v. Home Depot, et al*. 2005 U.S. Dist. LEXIS 44741, *14 (N.D. Cal. August 3, 2005) (Armstrong,

20  J.).

21     In the Ninth Circuit, Plaintiff must prove that "Sand Hill Advisors" acquired secondary

22  meaning *as of the time when Defendant first began using the term in April 1999.  Carter-Wallace,*

23  434 F.2d at 799 (A plaintiff must show secondary meaning prior to defendant's use of the mark);

24  *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985); *HMH Publishing Co. v.*

25  *Brincat*, 504 F.2d 713, 715 (9th Cir. 1974); *see also Roxane LLC v. Fiji Water Co. LLC*, 2008 U.S.

26  Dist. LEXIS 54726, *26-27 (N.D. Cal. May 30, 2008) (Whyte, J.) (holding that in order for plaintiff

27  to prove the validity of its mark, it must show "secondary meaning existed prior to the date on which

28

the defendant began using the same or similar mark.").  In determining whether a mark has acquired

secondary meaning, courts consider the following factors: (a) whether actual or potential customers

of the service associate the mark with the producer or a single source; (b) the degree and manner of

advertising of the claimed service mark and whether that advertising has been successful in having

consumers associate the service mark with a single source; (c) the amount of services provided under

the service mark; and (d) whether the alleged owner's use of the service mark has been substantially

exclusive for the immediate 5 year period before the claim of distinctiveness is asserted.  *Roxane*,

2008 U.S. Dist. LEXIS 54726 at *21-22.  Plaintiff has no credible evidence on any of these factors.

>    6.    <u>Plaintiff failed to conduct a consumer survey or provide any evidence showing that consumers associate Plaintiff's real estate investment services with Plaintiff.</u>

Evidence that consumers associate a particular service mark with a particular service

provider can be established in one of two ways: (i) through a consumer survey; or (ii) through

sufficient consumer testimonials showing that they associate the alleged mark with a single source.

*Seed Lighting Design*, 2005 U.S. Dist. LEXIS 44741 at * 14.  Plaintiff has neither type of evidence.

The Ninth Circuit has made clear that the most credible and persuasive evidence of

secondary meaning is through a consumer survey of the relevant market conducted by a trained

expert.  *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1995).  In fact, the absence

of a consumer survey typically is fatal, and failure to support a claim with survey evidence, at a

minimum, raises a presumption or inference that the results would have demonstrated a lack of

secondary meaning.  *Instant Media Inc. v. Microsoft,* 2007 U.S. Dist. LEXIS 61443, *42 (N.D. Cal.

August 13, 2007) (Armstrong, J.), quoting *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1014

(C.D. Cal. 1998) ("[A] plaintiff's failure to conduct a consumer survey, assuming it has the financial

resources to do so, may lead to the inference that the results of such survey would be unfavorable.").

In this case, Plaintiff was required to disclose expert testimony regarding any consumer survey by

September 30, 2009.  It did not disclose such an expert, which leads to the presumption that Plaintiff

knows the results of a survey would be unfavorable.

Plaintiff also has failed to identify a single consumer that could provide testimony at trial to support its claim that "Sand Hill Advisors" is exclusively associated with the Plaintiff. *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993) (A trademark only acquires secondary meaning when the purchasing public associates the mark with a single source.). Plaintiff's Rule 26(a) disclosures list only six individuals who may provide testimony at trial—four of these individuals are either current or former members of its Board of Directors. (Ex. H to Davidson Dec., Plaintiff's Rule 26(a) Disclosures at pp. 2-3). Nevertheless, testimony by any of these individuals has "little probative value." *Self-Realization,* 59 F.3d at 910 ("Attestations from persons in close association and intimate contact with the trademark claimant's business does not reflect the views of the purchasing public."). The remaining two witnesses identified by Plaintiff are Messrs. Sandell and Hill, Defendant's founders. (Ex. H to Davidson Dec., Plaintiff's Rule 26(a) Disclosures at pp. 2-3). Plaintiff has utterly failed to provide any direct evidence that consumers actually associated "Sand Hill Advisors" with Plaintiff's real estate investment services by April 1999, let alone that consumers do now. Thus, it cannot meet its burden to show that "Sand Hill Advisors" has secondary meaning.

> 7. <u>Plaintiff has engaged in virtually no advertising under "Sand Hill Advisors," and does not do *any* advertising for its supposed "real estate investment services."</u>

"To demonstrate secondary meaning based on advertising, the advertising must be of a nature and extent to create an association with the advertiser's goods." *Art Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009). Accordingly, Plaintiff's advertising expenditures are probative of secondary meaning only if it can show that its advertising has actually caused consumers to associate its services with the Plaintiff. *Seed Lighting Design*, 2005 U.S. Dist. LEXIS 44741 at * 19-20. Here too, Plaintiff fails.

Plaintiff admitted that it does not do *any* advertising of its real-estate investment services. (Ex. B to Davidson Dec., Williams Dep. at 42:25-43:5; 44:21-24) (Q: "Does your business advertise that it provides investment advice regarding the real estate market? A. No. . . . Q: So I take it you don't advertise to the general consuming public that you provide advice regarding investing in REITS [Real Estate Investment Trusts]? A. Correct."). Even Plaintiff's general marketing and

advertising efforts, especially prior to 1999, are limited at best.  Mr. Conway testified that from the period of 1995-2000, Plaintiff did not engage in any advertising or produce "sales literature or that sort of thing."  (Ex. C to Davidson Dec., Conway Dep. at 85:11-86:5).  Rather, Plaintiff's marketing efforts consisted simply of "word of mouth" advertising.  (*Id.*).  Plaintiff's marketing expenditures further underscore the paucity of its marketing and advertising prior to April 1999.  Plaintiff's only purported "evidence" documenting its advertising expenditures from 1995 through 1997 timeframe, is its own unverifiable estimate that it spent about $20,000.  (Ex. I to Davidson Dec., Response to Interrogatory No. 16).  For the years 1998 and 1999, Plaintiff produced redacted quarterly income statements, supposedly showing that it spent approximately $20,000 for unspecified "Promotion/Advertising" and "Printing and Reproduction."  (Ex. J to Davidson Dec. (filed under seal)).  None of this proffered evidence, however, has any probative value. *Target Brands, Inc. v. Hughes*, 85 U.S.P.Q.2d 1676, 1681 (T.T.A.B. 2007) (sales figures "standing alone and without any context in the trade" were not sufficient; popularity of product did not show customers viewed ULTIMATE POLO as a source-identifying mark).  Plaintiff's estimate, without evidentiary support, that it spent approximately $20,000 from 1995-1997, is pure speculation, not evidence.  Likewise, its bare income figures purportedly showing that it spent $20,000 in 1998 and 1999 are paltry and devoid of context. *See Aromatique, Inc. v. Gold Seal, Inc*., 28 F.3d 863, 872 (8th Cir. 1994) (recognizing importance of itemizing promotional expenses because not all such expenses contribute to the creation of secondary meaning).  Even if Plaintiff's guesswork and unspecified income statements could somehow count as evidence, this information still is insufficient to establish that "Sand Hill Advisors" acquired secondary meaning. *Carter-Wallace*, 434 F.2d at 800 (amount, nature and quality of advertising must be shown, along with the resultant effect such efforts had upon the consuming public to establish secondary meaning).  Plaintiff has no evidence showing that any of its marketing expenditures actually were effective in gaining public recognition of its alleged mark "Sand Hill Advisors" at the time Defendant began using the term as part of its business name in April 1999, let alone does it now.  By all accounts, Plaintiff has failed to establish that "Sand Hill Advisors" acquired secondary meaning.

1

        8.    <u>Plaintiff admits that it is unable to indicate the amount of "real estate-related services" that it has provided under its alleged mark "Sand Hill Advisors."</u>

2

3       Although a claimed service mark owner's "amount of sales and number of customers" can

4 theoretically establish secondary meaning, Plaintiff has admitted that it is unable to quantify the

5 amount of real estate investment services it provides or any dollar amount associated with those

6 services. *See Art Attacks Ink, LLC*, 581 F.3d at 1145. In her deposition, Ms. Williams was asked:

7 "How much revenue on an annual basis is attributable to your services where you provide

8 investment advice regarding the real estate market?" She answered, it was "impossible to break

9 out." (Ex. B to Davidson Dec., Williams Dep. at 43:6-20). When she was asked why it was not

10 possible to ascertain this amount, Ms. Williams succinctly admitted: "I don't track it that way." (*Id.*

11 at 44:7-16; *see also*, Ex. A to Davidson Dec., McCaffrey Dep. at 50:19-51:5). Since Plaintiff has no

12 evidence to document the revenue associated with its purported real estate investment services, on

13 this basis too, it cannot show that the Sand Hill Advisors mark acquired secondary meaning.

14

        9.    <u>Plaintiff's use of "Sand Hill Advisors" has not been exclusive, but has competed for many years with companies using similar names for similar services.</u>

15

16

17       15 U.S.C. § 1052(f) (often times referred to as "Section 2(f)") provides that secondary

18 meaning may be presumed if the mark holder establishes "proof of substantially exclusive and

19 continuous use" of the mark "for the five years before the date on which the claim of distinctiveness

20 is made." For at least two compelling reasons, Plaintiff cannot establish secondary meaning under

21 Section 2(f). First, as a matter of law, Plaintiff must establish that "Sand Hill Advisors" acquired

22 distinctiveness *before* Defendant began using the term in April 1999. *Roxane*, 2008 U.S. Dist.

23 LEXIS 54726 at *21-22. Because Plaintiff only began using "Sand Hill Advisors" on December 31

24 1995, it cannot establish the five year exclusivity period before Defendant began using the alleged

25 mark. As a result, any claim under Section 2(f) fails for this reason alone.

26       Second, Plaintiff's use of "Sand Hill Advisors" is far from "substantially exclusive." Rather,

27 third party use of the term "Sand Hill" is rampant in the market place. *Classic Foods Intern. Corp.*

28

*v. Kettle Foods, Inc.* 468 F. Supp.2d 1181, 1195 (C.D. Cal. 2007) ("Continuous use for 25 years, where at least 15 others also used the term in connection with their products 'prevents KFI from proving secondary meaning.'").  The term "Sand Hill" appears as part of numerous other business names associated with financial and investment services, many of which operate within close proximity to Plaintiff.  (*See, infra*, section C. 1).  In fact, Ms. Williams confirmed "that there are other companies that are involved in financial services or in the financial markets one way or another and also use the Sand Hill portion."  (Ex. B to Davidson Dec., Williams Dep. at 34:12-35:6; 36:18-37:11; *see also* Ex. A to Davidson Dec., McCaffrey Dep. at 167:23-169:24; Ex. C to Davidson Dec., Conway Dep. at 78:11-19).  Wide spread use of the name "Sand Hill" by third parties in the marketplace completely undercuts any claim of secondary meaning based on Plaintiff's exclusive use. *See Instant Media,* 2007 U.S. Dist. LEXIS 61443 at *36-37.

Put simply, Plaintiff fails on every level to show that "Sand Hill Advisors" acquired secondary meaning for its purported real estate investment services by April 1999.  As a result, Defendant is entitled to summary judgment on this basis alone.

### C. **Even if Plaintiff *Could* Establish That "Sand Hill Advisors" is a Protectable Service Mark, it Cannot Show That Defendant's Use of the Mark is Likely to Cause Confusion Among an Appreciable Amount of Consumers.**

Even if Plaintiff has a protectable service mark, it must produce evidence that an "appreciable amount" of consumers are likely to be confused by Defendant's use of the term "Sand Hill Advisors." *Entrepreneur Media*, 279 F.3d at 1151.

In assessing whether the likelihood of confusion exists, the Ninth Circuit applies the *Sleekcraft* factors.  Those factors are:  (1) strength of plaintiff's mark; (2) similarity of the marks; (3) proximity of the goods; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of care likely to be exercised by the purchaser; and (7) defendant's intent in selecting the mark.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) (abrogated in part on other grounds).  As demonstrated below, the undisputed evidence overwhelmingly favors Defendant on virtually all of these factors.

1

         1.   <u>Plaintiff's supposed service mark is commercially weak because it exists in a "crowded field" of similar marks for investment-related services.</u>

2

3        The strength of a service mark is judged by its "conceptual strength" and its "commercial

4 strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). As discussed,

5 Plaintiff's trademark is primarily geographically descriptive and, at best, is conceptually weak. But

6 even if Plaintiff could show that "Sand Hill Advisors" is "conceptually strong," its "commercial

7 strength" is still weak. The Ninth Circuit has made clear that even if a mark is conceptually strong,

8 it will be classified as "weak" where there has been extensive third party use of similar marks on

9 similar goods. *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.

10 1988) (*abrogation in part on other grounds recognized by Eclipse Assocs. Ltd. v. Data Gen. Corp.,*

11 894 F.2d 1114, 1116 n.1 (9th Cir. 1990)); *see also PostX Corp. v. docSpace Co., Inc.*, 80 F. Supp.2d.

12 1056, 1061 (N.D. Cal. 1999) (Whyte, J.) (Where a plaintiff's mark exists in a crowded field,

13 "hemmed in on all sides by similar marks on similar goods," it is weak as a matter of law.).

14        Here, there is widespread third-party use of the term "Sand Hill" in the market place. The

15 term "Sand Hill" appears as part of numerous other business names associated with the financial and

16 investment fields, many of which operate within close proximity to Plaintiff in the Bay Area. These

17 businesses include: "Sand Hill Angels" (Los Altos); "Sand Hill Financial," (Menlo Park); "Sand

18 Hill Finance," (Silicon Valley); "Sand Hill Capital" (Sand Hill Road, Menlo Park); "Sand Hill

19 Econometrics" (Palo Alto);"Sand Hill Equity Research," (Palo Alto); "Sand Hill Partners," (Silicon

20 Valley) Sand Hill Consulting Associates" (Santa Rosa); and "Sand Hill Group LLC," (San

21 Francisco). (Ex. D to Davidson Dec.). The California Secretary of State's website further attests to

22 the wide-spread third-party use of "Sand Hill." (Ex. K to Davidson Dec.); *see also Empire Nat'l*

23 *Bank of Traverse City v. Empire of America, FSA*, 559 F. Supp. 650, 655 (W.D. Mich. 1983)

24 (Plaintiff's "Empire" mark for financial services found weak and without secondary meaning due to

25 uses of "Empire" by numerous other financial institutions).

26        Plaintiff, itself, admits that there is widespread third-party use of "Sand Hill" in the market

27 place. In response to the USPTO's initial refusal of its service mark application, Plaintiff took the

28

position that the term "Sand Hill" had become diluted because of the large number of similar marks in use in "investment management."  (Ex. G to Davidson Dec. p.3 of 8).  Thus, by Plaintiff's own admission "Sand Hill Advisors" is commercially weak.  *See Top Tobacco, L.P. v. N. Atl. Operation Co.*, 2007 WL 118527, \*7 (N.D. Ill. Jan. 4, 2007), *aff'd* 509 F.3d 380 (7th Cir. 2007) (finding concessions before the USPTO that "Top" marks for tobacco are common belied plaintiff's claim that its "Top" mark for tobacco is strong.).  Plaintiff also admits that it has been confused with other investment service companies using "Sand Hill" as part of their business name (Ex. A to Davidson Dec., McCaffrey Dep. at 167:23-169:24).  Ms. Williams confirmed the same.  (Ex. B to Davidson Dec., Williams Dep. at 34:12-35:6; 36:18-37:11).  This confusion simply underscores that Plaintiff operates in a "crowded field."  This *Sleekcraft* factor decisively favors Defendant.

> 2.    The similarity between Plaintiff and Defendant's use of "Sand Hill Advisors" is not sufficient to create a triable issue of fact.

The second *Sleekcraft* factor evaluates the similarity of the marks in terms of their sight, sound and meaning and marks must be considered as they appear in the marketplace.  *M2 Software, Inc., v. Madacy Entertainment*, 421 F.3d 1073, 1082 (9th Cir. 2005).  Defendant does not dispute that on its face; its use of the term "Sand Hill Advisors" is similar in sight, sound and appearance to Plaintiff's use of the term.  This similarity, however, is not sufficient to create an issue of fact.  Since Defendant and Plaintiff use "Sand Hill Advisors" in entirely distinct markets, they are unlikely to be encountered by similar consumers in situations which would create confusion.  *See e.g.*, *Anstar Corp v. Domino's Pizza, Inc.*, 615 F.2d 252, 264-65 (5th Cir. 1980) (no likelihood of confusion between use of Domino for sugar and Domino's for pizza); *Local Trademarks, Inc. v. Handy Boys, Inc.*, 16 U.S.P.Q. 2d 1156 (T.T.A.B. 1990) (LITTLE PLUMBER for liquid drain opener held not confusingly similar to LITTLE PLUMBER for advertising services in the plumbing field); *Oxford Industries, Inc., v. JBJ Fabrics Inc.*, 6 U.S.P.Q.2d 1756 (S.D.N.Y 1984) ("JBJ" for wearing apparel not confusingly similar to "JBJ" for fabric printing); *Safeway Stores, Inc. v. Safeway Ins. Co.,* 657 F. Supp. 1307, 1315 (M.D. La. 1985) (no likelihood of confusion between use of SAFEWAY for

grocery and insurance services).  Thus, although Plaintiff and Defendant use "Sand Hill Advisors," this fact should not be dispositive.

                        3.      <u>Plaintiff's investment management business is not related to Defendant's commercial real-estate business.</u>

     The third *Sleekcraft* factor looks at whether the parties' services are related or complementary.  *M2 Software, Inc.*, 421 F.3d at 1081-82.  Generally, related services are those which would be reasonably thought by the buying public to come from the same source if provided under a similar mark.  *Sleekcraft*, 599 F.2d at 348.

     Plaintiff and Defendant's businesses are in no way related.  Plaintiff is a wealth and investment management firm and is a SEC registered investment advisor.  (Ex. A to Davidson Dec., McCaffrey Dep. at 44:23-45:23; Ex. C to Davidson Dec., Conway Dep. at 24:15-26:20).  It offers investment planning, retirement and estate planning, philanthropic strategies, divorce financial consulting and solutions for women in transition."  (Ex. A to Davidson Dec., McCaffrey Dep. at 36:1-43:2; Ex. C to Davidson Dec., Conway Dep. at 26:3-20; Ex. L to Davidson Dec.).  Its clientele are wealthy individuals, women in transition, foundations, endowments, and charitable organizations and individuals who are going through major life transitions like divorce, widowhood, or sudden wealth.  (Ex. A to Davidson Dec., McCaffrey Dep. at 37:10-39:3; 43:3-19).  Defendant's business shares no resemblance whatsoever with Plaintiff's.  Defendant simply purchases, owns, sells, manages and leases commercial real estate, for its own account.  (Hill Dec., ¶ 3).  Defendant does not and never has provided any services related to investment planning, wealth management or any other type of financial services, real estate or otherwise, to third parties.  (*Id.* at ¶ 4).  It works with the commercial real estate community, not wealthy individuals, women in transition, foundations, endowments, and charitable organizations.  (*Id.* at ¶ 5).  The parties' businesses are vastly different.  *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, 2004 WL 833595, *16 (N.D. Tex. Apr. 19, 2004) (dismissing plaintiff's trademark infringement claim because parties' noncompetitive career-counseling services and consumer-complaint forum service were unrelated as a matter of law).

1    Plaintiff's claim that its services overlap with Defendant because Plaintiff offers "a variety of

2    investment-related services, including, among others, counseling clients with respect to real-estate

3    investments, providing investment advice regarding the real-estate market, providing access to real-

4    estate investments to its clients and investing in Real Estate Investment Trusts, ("REITS")" rings

5    entirely hollow.  (*See* Complaint, Dkt. No. 1, ¶ 8).  Defendant does not offer any of these services

6    either.  (Hill Dec., ¶¶ 3-5).  Plaintiff outright admits that Defendant is not one of its competitors.

7    (Ex. C to Davidson Dec., Conway Dep. at 89:9-19; Ex. A to Davidson Dec., McCaffrey Dep. at

8    148:20-149:2).  In fact, Mr. Conway testified that Plaintiff does not compete with Defendant and that

9    it "never crossed paths" and had "no dealings" with Defendant.  (Ex. C to Davidson Dec., Conway

10   Dep. at 73:1-14, 88:20-89:19).  Mr. McCaffrey testified that Plaintiff has never purchased, sold, or

11   leased any form of real estate as a business service, and it does not work with real-estate brokers.

12   (Ex. A to Davidson Dec., McCaffrey Dep. at 50:10-52:14; *see also*, Ex. C to Davidson Dec.,

13   Conway Dep. at 31:1-32:7).  Likewise, Plaintiff's Chief Wealth Management Officer, Jane

14   Creighton, testified that "Sand Hill Advisors doesn't buy and sell assets," and it does not "lease

15   anything."  (Ex. M to Davidson Dec., Creighton Dep. at 116:1-13).  According to Ms. Creighton,

16   "[she] never had any reason to even be aware of what defendant has for sale or is leasing," and that

17   she does not really care.  (*Id.* at 116:20-117:4).

18   Plaintiff's attempt to characterize the relevant market broadly, as real estate services, so it

19   can squeeze into Defendant's line of business, similarly fails.  *Astra Pharmaceutical Products, Inc.*

20   *v. Beckman Instruments, Inc*., 718 F.2d 1201, 1205-06 (1st Cir. 1983) (Granting summary judgment,

21   noting that a broad inference that goods overlap in the same general field "is not sufficient to

22   demonstrate that a genuine issue exists concerning likelihood of confusion").  Significantly, it would

23   be illegal for Plaintiff to purchase, own, sell, manage or lease commercial real estate for any third-

24   party, without having a real estate license, which Plaintiff does not have.  *See* Cal. Bus. & Prof. Code

25   §§10130-10149; (Ex. A to Davidson Dec., McCaffrey Dep. at 50:10-22).[4]  In short, Plaintiff and

26

27   [4] Any person or business that, among other things, purchases, owns, sells, manages or leases real estate for a third-party, is required to have a real estate license.  Cal. Bus. & Prof. Code §§10130-10149.  Since Defendant acts for its own account, and not for third-parties, it is not required to have a real estate license.

28

Defendant's businesses share absolutely nothing in common.  This *Sleekcraft* factor unquestionably favors Defendant.

              4.      <u>Plaintiff and Defendant do not use the same marketing channels.</u>

      A lack of any significant overlap in advertising markets, "weighs heavily in the ultimate assessment that there is no triable issue of the likelihood of confusion."  *M2 Software, Inc.*, 421 F.3d at 1083-84.  As a threshold matter, Plaintiff admits that it does not market any services related to real estate.  (Ex. B to Davidson Dec., Williams Dep. at 40:18-44:24).  This fact, alone, should end the inquiry in favor of Defendant on this *Sleekcraft* factor.  Nevertheless, Defendant's primary channel of communicating information about its business is the Internet.  (Hill Dec., ¶ 6).  Defendant notifies the brokerage community about potential property leasing or purchase opportunities by creating a unique property-addressed website (for example: www.500ParkRoad.com) for each of its available properties, which provides information, such as the property's location, size, and leasing price, as well as Defendant's contact information.  (*Id.*; *see also* Ex. B to Hill Dec.).  Defendant also uses Loopnet.com, which is a subscription-based commercial real estate information service provider that, among other things, provides listings for commercial real estate.  (Hill Dec., ¶ 6).  Its other channels of communication are banners, and signs at its property locations and fliers which direct recipients to its website property listings.  (*Id.*).

      Plaintiff, on the other hand, does not advertise on the Internet.  (Ex. A to Davidson Dec., McCaffrey Dep. at 167:8-13).  This fact too, fundamentally separates it from Defendant.  Even more compelling, however, is Mr. McCaffrey admitted that he did not believe that consumers would confuse Defendant's commercial property listings with services that Plaintiff offers.  (*Id.* at 206:21-207:19) (Q. Is it your position Mr. McCaffrey, that by consumers looking at these photos here on Exhibit 19 showing various pictures of lots, warehouses, commercial office space, would consumers be confused between these services or real estate services and your wealth-advisory firm? A. No. Q. You don't? A. No.).  Nevertheless, even without this admission, Plaintiff still cannot credibly claim that its marketing efforts overlap with Defendant.  It claims its marketing channels are: "community activities," "meeting people," "quarterly news letters," "Attorney roundtables," and sponsoring and

hosting events.  (Ex. B to Davidson Dec., Williams Dep. at 47:7-49:2).  Defendant uses *none* of these marketing channels.  By Plaintiff's own admission, this *Sleekcraft* factor favors Defendant.

> 5.  Plaintiff's customers are sophisticated and presumed to exercise a high degree of care in service choices.

Confusion also is unlikely here because the Plaintiff's services are directed to consumers who exercise a high degree of care.  In evaluating this *Sleekcraft* factor "the standard used by the courts is the typical buyer exercising ordinary caution."  *Sleekcraft*, 599 F.2d at 353.  The more sophisticated the buyer, the less likelihood of confusion.  *Instant Media*, 2007 U.S. Dist. LEXIS 61443 at *16.  Also, when services are expensive, consumers are expected to exercise greater care. *Switchmusic.com., Inc. v. U.S. Music Corp.*, 416 F. Supp. 2d 812 (C.D. Cal. 2006).  This *Sleekcraft* factor undisputedly favors Defendant.   First, Plaintiff itself admits that it "provides wealth management services to about one hundred seventy-five (175) high net worth clients; both *sophisticated investors* as well those that are newly wealthy." (Ex. A to Davidson Dec., McCaffrey Dep. at 59:11-17 (emphasis added); *see also* Exhibit L to Davidson Dec.).  Second, Plaintiff offers investment management and financial planning services to high net worth clients with assets over two and a half million dollars. (*Id.* at 52:15-22).  Sixty percent (60%) of Plaintiff's clients have been with the company for approximately fifteen years and ninety-five percent (95%) of Plaintiff's customers are based on referrals. (*Id.* at 56:1-5, 54:15-20).  This group already is making a guided business choice. *Sioux v. First Nat'l Bank S.D.*, 153 F.3d 885, 889-90 (8th Cir. 1998) (consumers exercise a relatively high degree of care in selecting financial services).  Defendant also works with sophisticated individuals, namely licensed commercial real estate brokers, who are experienced in the real estate market.  Commercial real estate also is expensive and is not an impulse purchase.  It is inconceivable that commercial real estate brokers are going to confuse Defendant with a SEC registered, highly-regulated, wealth advisory firm.  In summary, consumers will not be confused here, and "sophisticated consumers" are even less likely to be confused.  Thus, this *Sleekcraft* factor favors Defendant.

6.   <u>Plaintiff has failed to produce any meaningful evidence of actual confusion despite the fact that it has co-existed with Defendant in the same geographical location for approximately nine years.</u>

The Ninth Circuit "cannot think of more persuasive evidence that there is no likelihood of confusion between two marks than the fact that they have [been] simultaneously used for five years without causing any consumers to be confused as to who makes what." *Brookfield Communications Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999). The evidence in this case is even more persuasive. Plaintiff and Defendant have been operating under variations of the alleged service mark "Sand Hill Advisors" simultaneously for *more than nine* years without evidence of even a single consumers being confused.

Actual confusion can be established by either: (i) producing the testimony of consumers that have been confused; or (ii) producing a consumer survey that shows consumers are actually confused. *Levi Strauss*, 778 F.2d at 1360. Plaintiff has failed to do either. As previously discussed, it failed to conduct a consumer survey and it cannot offer testimony from its own executives or even a single consumer who has been confused. In a last ditch effort to orchestrate evidence of actual consumer confusion, when none exists, Plaintiff relies on a misdirected spam e-mail (which attempts to entice Defendant into buying an award for itself) and an invoice it mistakenly received for irrigation work performed at one of Defendant's properties (Ex. N to Davidson Dec., Response to Interrogatory No. 6; Ex. O to Davidson Dec.; Ex. P to Davidson Dec.). Neither of these communications reflects consumer confusion over the parties' services and both post-date Plaintiff's lawsuit. The only confusion relevant in the *Sleekcraft* analysis is confusion among potential customers seeking the parties' goods or services, and none has occurred in this situation. *Echo Drain v. Newsted*, 307 F.Supp. 2d 1116, 1126-27 (C.D. Cal. 2003) (relevant confusion is that which affects consumer purchasing decisions). Nor is this misdirected correspondence sufficient to establish that an *appreciable amount* of consumers are likely to be confused. *Entrepreneur Media*, 279 F.3d at 1140 (*De minimis* evidence of confusion over a long period of time leads to an inference that confusion is not probable.). Plaintiff does not dispute these points. With respect to the misdirected irrigation invoice, Mr. McCaffrey testified: "I don't think there is confusion between our

services as a result of this." (Ex. A to Davidson Dec., McCaffrey Dep. at 187:17-188:25).  Plaintiff cannot show that an appreciable number of consumers are likely to be confused by Defendant's use of "Sand Hill Advisors."   In fact, Plaintiff has failed to identify any consumer that has been confused.  (*Id.* at 245:25-246:14; *see also* Ex C to Davidson Dec., Conway Dep. at 71:6-72:18).

       7.    <u>There is no evidence that Defendant intended to infringe Plaintiff's alleged mark.</u>

The seventh *Sleekcraft* factor considers the good faith of a defendant and whether it adopted the accused mark with the intention of capitalizing on Plaintiff's goodwill or reputation.  *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1406 (9th Cir. 1993).  Plaintiff is required to show that Defendant attempted "to gain the value of an established name of another" and "knowingly and deliberately cashing in on the goodwill of the infringed."  *Id.*  Plaintiff has no evidence that Defendant adopted the term "Sand Hill Advisors" to trade-off of its so-called goodwill.  The evidence, in fact, establishes exactly the opposite.  Defendant adopted "Sand Hill Advisors" as a part of its business name based on the first four letters on its members' (Bert Sandell and Al Hill) last names, and at that time, they did not know of Plaintiff.  (Hill Dec., ¶ 2; *see also* Ex. Q to Davidson Dec., Sandell Dep. at 91:12-23).  Messrs. Sandell and Hill testified that they learned of Plaintiff in late 2000 or early 2001, when Boston Private's acquisition of Plaintiff made the mainstream press via a corporate press release.  (Ex. R to Davidson Dec., Hill Dep. at 30:10-18; *see also* Ex. Q to Davidson Dec., Sandell Dep. at 117:14-25; 182:2-17.);  *Brennan's Inc. v. Brennan,* 512 F. Supp. 2d 559, 568-69 (S.D. Miss. 2007) (rejecting plaintiff BRENNAN's argument that defendants adopted their trademark BRENNAN's with the intent to capitalize on plaintiff's goodwill, where "defendants simply wanted to use their own names on their own restaurants").  Other than its unsubstantiated accusations and conjecture that Defendant knew or should have known about Plaintiff when it selected its name, Plaintiff has presented no evidence that Defendant knew of it or adopted its business name in bad faith.  Even if Plaintiff could somehow show that Defendant had knowledge of Plaintiff when it selected its name (it cannot), this does not transform it into an intentional infringer.  It is well established that mere knowledge of the existence of another's mark does not constitute

1   deliberate infringement or bad faith. *See Seed Lighting Design*, 2005 U.S. Dist. LEXIS 44741 at

2   *20-23, citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844 (9th Cir. 1987) (The

3   relevant intent is not just the intent to copy, but, rather, the intent to "pass off" one's goods as those

4   of another). Plaintiff has no evidence Defendant, whom it admits is not its competitor, intended to

5   gain some benefit from Plaintiff when it adopted its name back in April 1999.

6              8.      There is no likelihood of expansion.

7          Any purported expansion plans must be supported by admissible evidence; vague assertions

8   are insufficient to demonstrate that the parties' uses of their respective marks are likely to converge.

9   *Surfvivor Media*, 406 F.3d at 634. Plaintiff has provided no evidence whatsoever that it intends to

10  expand its business to include purchasing, owning, selling, managing, and leasing commercial

11  industrial office properties for its own account. *Id.* (Plaintiff's "complete inability to adduce any

12  concrete evidence of expansion plans tilts this factor in favor of defendant."). Defendant has no

13  intention of expanding its business into the wealth management industry. (Hill Dec. ¶ 12). Since

14  Plaintiff has failed to produce any concrete evidence that it likely will expand, this factor favors

15  Defendant.

16                  **IV.   CONCLUSION**

17         Plaintiff has failed to create a genuine issue of triable fact to sustain its Complaint for Willful

18  Service Mark Infringement. Defendant's Motion for Summary Judgment, therefore, should be

19  granted.

20

21  DATED: November 18, 2009            K&L GATES LLP

22

23                                  By: _____/s/_____

24                                      Rachel R. Davidson
                                        Attorney for Defendant
25                                      SAND HILL ADVISORS LLC

26

27

28