UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAND HILL ADVISORS, LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>vs.<br><br>SAND HILL ADVISORS, LLC, a California limited liability company,<br><br>    Defendant. | Case No: C 08-5016 SBA<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket 36 |

Plaintiff, Sand Hill Advisors LLC, a Delaware limited liability company, filed the instant service mark infringement action under the Lanham Act seeking to prevent Defendant, Sand Hill Advisors LLC, a California limited liability company, from continuing to use the mark "Sand Hill Advisors." The parties are presently before the Court on Defendant's Motion for Summary Judgment. On January 12, 2010, the parties appeared through counsel for oral argument on the motion. Having reviewed the motion papers submitted and considered the arguments of counsel in connection with this matter, the Court GRANTS the motion for the reasons set forth below.

I.  **BACKGROUND**

   A.  **SAND HILL ADVISORS LLC, A DELAWARE LIMITED LIABILITY COMPANY**

Plaintiff is a self-styled "wealth management" firm currently located in Menlo Park, California. (Williams Decl. ¶ 2.) The firm is the successor-in-interest to CLW Financial Services, Inc., a company founded in 1982 by Jane Williams, Gary Conway and Joseph Luongo. (Id.) Since around 1995, Plaintiff has provided a variety of financial and advisory

services to its "high net-worth" clients to assist them in the investment and management of their assets. Such services include investment planning, retirement and estate planning and philanthropic strategies. (Williams Decl. ¶ 10; Davidson Decl. Ex. L.) At present, Plaintiff manages between $800 million to a $1 billion in assets. (Davidson Decl. Ex. A, McCaffrey Depo. at 131:9-10; Davidson Decl. Ex. L.) Although it is not engaged in the purchase or sale of real estate on behalf of its clients, Plaintiff does provide advice and counseling on investments in real property and Real Estate Investment Trusts, real estate financing alternatives, management alternatives, asset allocation and trends in the real estate market. (McCaffrey Depo. at 51:6-52:14; Williams Decl. ¶ 10.)

Since its founding in 1982, Plaintiff has undergone a number of name changes. In June 1982, CLW Financial Services, Inc., became known as Conway, Luongo, Williams, Inc. (Id. ¶ 3 and Ex. B.) In October 1989, Conway, Luongo, Williams, Inc., changed its name to Conway, Williams & Foster, Inc. (Id. ¶ 4 and Ex. C.) In March 1999, Conway, Williams & Foster, Inc., again changed its name to Sand Hill Advisors, Inc. (Id. ¶ 5 and Ex. D.) At the time of the most recent name change, Plaintiff was located at 3000 Sand Hill Road in Menlo Park, California, which is part of what is commonly referred to as the "Silicon Valley." (Davidson Decl. Ex. B, Williams Depo. at 24:9-11.)

According to its founders, they changed the firm name to "Sand Hill Advisors" because of recent developments in its business and accompanying desire to no longer use individual's names to identify the firm. (Id. at 23:3-15; Williams Decl. ¶ 5.) To that end, Plaintiff selected "Sand Hill Advisors" because it reflected the firm's location and allowed it to capitalize on the "cache" associated with that area, which is known for its concentration of venture capital firms. (Davidson Decl. Ex. C, Conway Depo. at 24:1-12 ("at the time we were . . . located on Sand Hill Road. And so that was our address, but we felt it was an address that we wanted to trumpet."); Williams Depo. at 27:13-23 ("[W]e had been located at Sand Hill Road and actually were a very active part of the community around that area. We lived in that area. We worked in that area."); see also McCaffrey Depo. at 132:16-24, 134:7-10.)

In 2000, Plaintiff changed its state of incorporation from California to Delaware, for reasons which were related to the acquisition of Plaintiff by Boston Private Financial Holdings ("Boston Private"). (Williams Decl. ¶ 9; McCaffrey Depo. at 66:1-3.) In November 2007, Plaintiff converted from a Delaware corporation to a Delaware limited liability company. (McCaffrey Depo. at 67:24-68:3; Williams Decl. ¶ 9.) This change was prompted by the decision of certain members of Plaintiff's management to reacquire equity from Boston Financial. (McCaffrey Depo. at 68:4-6.) Plaintiff then sought to change its name from "Sand Hill Advisors, Inc." to "Sand Hill Advisors, LLC." Plaintiff, however, was unable to register the new name with the California Secretary of State because Defendant had previously registered the name with the State in 1999. (McCaffrey Depo. at 212:7-10.)

**B.   SAND HILL ADVISORS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY**

Defendant is a California limited liability company formed by business partners Bert Sandell and Albert Hill, Jr., located in Los Altos, California. (Hill Decl. ¶ 2.) Messrs. Sandell and Hill filed their Limited Liability Company Articles of Organization with the California Secretary of State on April 27, 1999. (Id. Ex. A.) The Articles of Registration identify Defendant's "[t]ype of business" as follows: "To engage in any lawful business for which limited liability companies may be organized in California including real estate activities, finance and advisory services." (Id.) Messrs. Sandell and Hill selected the name "Sand Hill" by combining the first four letters of Mr. Sandell's last name with Mr. Hill's last name. (Id.)

Defendant's business focuses on purchasing, holding, selling, managing and leasing commercial real estate in the San Francisco Bay Area solely for its own investment purposes. (Id. ¶ 2.) Typically, Defendant purchases commercial property, which it then assigns to another limited liability company or entity owned by Messrs. Sandell and Hill. (Id. ¶ 3.) Since 1999, Defendant has closed between seven to ten commercial real estate transactions. (Miller Decl. Ex. F, Hill Depo. at 115:11-22.) Defendant does not provide any services to the public and has never provided any financial, investment or any other advice to any third party. (Hill Decl. ¶ 4.) Since it began using the "Sand Hill Advisors LLC" mark in 1999, Defendant has

**1** received only five or six telephone calls and received a package intended for Plaintiff. (Id.
**2** ¶ 13.)

### C. PROCEDURAL HISTORY

As a result of Plaintiff's inability to register the name "Sand Hill Advisors LLC" with the California Secretary of State, Plaintiff filed suit against Defendant in this Court on November 4, 2008, alleging a single claim for service mark infringement under the Lanham Act. Shortly thereafter on November 17, 2008, Plaintiff sought to register "Sand Hill Advisors" as a service mark with the United States Patent and Trademark Office ("PTO"). On September 3, 2009, the PTO rejected Plaintiff's application on the basis that "Sand Hill" is "primarily geographically descriptive" under 15 U.S.C. § 1502(e)(2). (Davidson Decl. Ex. F at 2.) As to the word "Advisors," the PTO found that such term is generic or descriptive, and that its inclusion in the proposed mark did not diminish its finding that the mark is primarily geographically descriptive. (Id.)

On November 19, 2009, Defendant filed the instant Motion for Summary Judgment. In its motion, Defendant contends that Plaintiff cannot demonstrate that "Sand Hill Advisors" is a protectable mark or that Defendant's use of the mark is likely to confuse the public. Plaintiff has filed an opposition to the motion, accompanied by objections to certain of the evidence offered by Defendant in support of its motion. Defendant filed a reply memorandum, and the matter is now fully briefed. The parties, through counsel, appeared for argument on the motion on January 12, 2010. At the conclusion of the hearing, the Court took the matter under submission.

## II. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

An issue of fact is "material" if, under the substantive law of the case, resolution of the factual dispute might affect the outcome of the claim. Anderson, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." Id. at 250. Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted). Only admissible evidence may be considered in ruling on a motion for motion for summary judgment. Fed.R.Civ.P. 56(e); Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir.2002).[1]

## III. DISCUSSION

To establish service mark infringement under the Lanham Act, the plaintiff must show that (1) it has a valid, protectable mark, and (2) defendant's use of the mark is likely to cause confusion. See Applied Info. Sciences v. Ebay, Inc., 511 F.3d 966, 969 (9th Cir. 2007). Defendant contends that Plaintiff cannot meet either element of the test for service mark infringement, as a matter of law. Summary judgment may be entered in a trademark action "when no genuine issue of material fact exists." Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 630 (9th Cir. 2005). The Court therefore addresses each prong of the test for service mark infringement to ascertain whether summary judgment is appropriate based on the record presented.

---

[1] Plaintiff objects to the declaration of Albert Hill on the ground that he did not sign it under penalty of perjury. Defendant has since corrected this error by submitting a properly verified version of Mr. Hill's declaration. (Davidson's Reply Decl. Ex. A.) None of the remaining evidence to which Plaintiff has interposed objections is necessary to adjudicate the instant motion. For these reasons, Plaintiff's Objections to Defendant's Evidence Offered in Support of Defendant's Motion for Summary Judgment (Docket 45) are denied as moot.

## A. PROTECTABLE MARK

The amount of protection accorded to a particular mark is a function of its distinctiveness. "Marks are often classified in categories of generally increasing distinctiveness; . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). "The latter three categories of marks, because their intrinsic nature, serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." Id. at 769. At the other end of the spectrum are generic marks, which are not protected. Id. That leaves "descriptive" marks, which are not considered inherently distinctive because they define a particular characteristic of a product in a way that does not require any exercise of the imagination. Surfvivor Media, 406 F.3d at 631-32. However, descriptive marks may acquire distinctiveness through use in commerce. Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1196 (9th Cir. 2009). "This acquired distinctiveness is generally called 'secondary meaning.'" Two Pesos, 505 U.S. at 769.

There are three ways in which a plaintiff can establish that it has a protectable interest in a service mark or trademark: "(1) it has a federally registered mark in goods or services; (2) its mark is descriptive but has acquired a secondary meaning in the market; or (3) it has a suggestive mark, which is inherently distinctive and protectable." Applied Info Sciences Corp. v. eBAY, Inc., 511 F.3d 966, 969-970 (9th Cir. 2007).[2] Registration of a mark is prima facie evidence of its validity, as well as its owner's entitlement to use the mark exclusively as specified in the registration. Id. at 970. Where, as here, the mark is not registered, a plaintiff must establish that its mark either is inherently distinctive, or has acquired distinctiveness through secondary meaning. Lahoti, 586 F.3d at 1197.

---

[2] "[T]he only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services. Service marks and trademarks are governed by identical standards . . . ." Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1156 (9th Cir. 2001). In general, the same analytical framework applies to infringement claims, irrespective of whether the marks or names are registered with the PTO. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 n.3 (9th Cir. 2000).

### 1. Primarily Geographically Descriptive

Defendant argues that "Sand Hill Advisors" is a "primarily geographical descriptive" mark lacking any secondary meaning, and hence, is not subject to protection. (Mot. at 7-10.) "A geographically descriptive term or phrase is one that designates geographical location and would tend to be regarded by buyers as descriptive of the geographic location of origin of the goods or services." Forschner Group, Inc. v. Arrow Trading Co., Inc., 30 F.3d 348, 355 (2d Cir. 1994) (internal quotation marks omitted). "The Legislative History of the Lanham Act points out that where a logical connection can be made between the product and the geographical term, the term is geographically descriptive" Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc., 871 F.2d 590, 595 (6th Cir. 1989); e.g., In re Wada, 194 F.3d 1297, 1299-1300 (Fed. Cir. 1999) (affirming PTO ruling that "New York Ways Gallery" was primarily geographically descriptive because "NEW YORK is not an obscure geographical term and that it is known as a place where the goods at issue here are designed, manufactured, and sold . . . .").

The mere fact that a mark references a geographic location does not ipso facto lead to the conclusion that the mark is descriptive. See Japan Telecom, Inc. v. Japan Telecom Am. Inc., 287 F.3d 866, 871 (9th Cir. 2002) (use of "Japan" in "Japan Telecom, Inc." did not "automatically make the trade name geographically descriptive"); Forschner Group, 30 F.3d at 355 ("That a phrase or term evokes geographic associations does not, standing alone, support a finding of geographic descriptiveness."). Rather, the relevant inquiry is whether, upon consideration of all terms comprising a composite mark, "the term is being used geographically." Japan Telecom, 287 F.3d at 871; see also Comm. for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 821 (9th Cir. 1996).

Here, there is no dispute that "Sand Hill" refers to a geographical locale on or near Sand Hill Road in the Silicon Valley and that Plaintiff, in fact, chose "Sand Hill" because its geographical significance. (McCaffrey Depo. at 132:12-133:8; Conway Depo. at 24:9-14.) Gary Conway testified at his deposition that the founders selected the "Sand Hill" name because the firm's offices were located on Sand Hill Road and they wanted to "trumpet" their

location due to its "cache." (Conway Depo. at 24:1-14.) He further stated that the location of Plaintiff's business "was very much part and parcel" to its decision to adopt "Sand Hill Advisors" as its name. (Id. at 24:11-14.) Co-founder Jane Williams similarly confirmed the geographical significance of "Sand Hill." She testified that such mark was chosen because of its geographical reference, since they worked and lived in that area, and were active in the community. (Williams Depo. at 27:13-23.) These undisputed facts demonstrate the indeniably geographic significance of the "Sand Hill Advisors" mark. See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 14:7 (4th ed. 2004) ("Is the mark the name of the place or region from which the goods actually come? If the answer is yes, then the geographic term is probably used in a descriptive sense, and secondary meaning is required for protection.").[3]

Plaintiff nonetheless insists that "Sand Hill," when combined with "Advisors," is suggestive, as opposed to descriptive. (Opp'n at 14.) As support, Plaintiff relies on Rodeo Collection Ltd. v. W. Seventh, 812 F.2d 1215 (9th Cir. 1987). In that case, plaintiff Rodeo Collection, Inc., held several registered services marks for the mark "Rodeo Collection," which it used in connection with providing shopping center services. After Defendant announced plans to open a shopping center in downtown Los Angeles under the name "The Collection," plaintiff filed suit for federal service mark infringement. On appeal, the court addressed, among other things, the strength of the mark "Rodeo Collection." Id. The court explained that there are two tests to determine the strength of a mark in the marketplace: the "imagination test" and the "need test." Id. at 1218. "The 'imagination test' focuses on the amount of imagination required in order for a consumer to associate a given mark with the goods or services it identifies . . . . The 'need test' focuses on the extent to which a mark is actually needed by competitors to identify their goods or services." Id. "The two tests are related

---

[3] Plaintiff's assertion that "Sand Hill Advisors" is suggestive also is at odds with Mr. Conway's acknowledgment the founders selected such name because it was "a more generic title." (Conway Depo. at 24:1.)

because '[t]he more imagination that is required to associate a mark with a product [or service], the less likely the words used will be needed to associate the mark with the product, "'the less likely the words will be needed by competitors to describe their products [or services].'" Id. (quoting Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 379 (7th Cir. 1976)).

The Rodeo Collection court held that under both tests, the mark "Rodeo Collection," and the component term "Collection" were "more than merely descriptive as used to identify a shopping center." Id. at 1218-19. As to the imagination test, the court explained that "[a] person would not be likely to picture a shopping center upon first hearing the name 'Rodeo Collection'" and that "some imagination" was necessary to associate the word "collection" with the collection of shops and restaurants that make up the shopping centers. Id. at 1219. With regard to the need test, the court noted that given the remoteness of the association between "collection" and a shopping center, "a competing shopping center would not need to use the term 'collection' in order to identify its own shopping center." Id.

Plaintiff attempts to analogize this case to Rodeo Collection, and argues that "Sand Hill Advisors" is suggestive, and not primarily geographically descriptive as claimed by Defendant. (Opp'n at 13-14.) However, the mark "Sand Hill Advisors" leaves little to the imagination. "Sand Hill" refers to a geographical locale where Plaintiff operates its business. "Advisors" aptly describes the nature of Plaintiff's business; to wit, it *advises* clients on maintaining and building their wealth. Plaintiff argues that "Advisors" requires imagination because it does not describe "wealth management" services in particular. (Opp'n at 13.) However, the Ninth Circuit has recognized that a mark need not precisely describe the services provided in order to be descriptive. Lahoti, 586 F.3d at 1201. Rather, the salient question for purposes of ascertaining whether a mark is descriptive is whether the mark conveys information regarding the nature of the goods or services. Id. Under that standard, the Court is persuaded that "Sand Hill Advisors" means exactly what it says: It describes a geographic location where Plaintiff offers advisory services.

Plaintiff's ancillary contention that "Sand Hill Advisors" satisfies the "need test" fares no better. As noted, the "need test" measures the extent to which a mark is necessary for

competitors to identify their goods and services. Rodeo Collection, 812 F.2d at 1218. Plaintiff summarily asserts that "there is no need for other wealth management firms to use 'Sand Hill Advisors' in describing or advertising their services." (Opp'n at 14.) Plaintiff provides no analysis or legal authority for its position. In any event, little imagination would be required for a consumer to connect "Sand Hill Advisors" with other companies that are located in or near the Sand Hill area whose service is providing advice. As such, other advisory companies are more likely to refer to "Sand Hill" and "Advisors" in describing or advertising their services. This is indicative of a descriptive mark.

Next, Plaintiff asserts that "Sand Hill" is suggestive ostensibly because it evokes qualities "associated with the Silicon Valley entrepreneurial community much like 'Broadway' evokes qualities associated with New York's commercial theatre district and 'Rodeo' evokes connotations of upscale shops in Beverly Hills." (Opp'n at 14.) Yet, there is no evidence to support Plaintiff's assertion that "Sand Hill" evokes an "entrepreneurial" spirit. In addition, Plaintiff ignores that "[t] he question is whether the phrase *can be* construed to mean that the product is made in a certain locale." Forschner, 30 F.3d at 355 (emphasis added). Here, there is no dispute that Sand Hill can be construed to mean that Plaintiff is an advisory firm based in the Sand Hill area—and indeed, that name was selected by Plaintiff because they, in fact, were then located on Sand Hill Road. Thus, the Court concludes that "Sand Hill Advisors" is primarily geographically descriptive. Having so decided, the Court turns to the issue of whether the mark has acquired secondary meaning.

### 2. Secondary Meaning

A descriptive mark may be subject to protection under the Lanham Act if it has acquired a secondary meaning. Two Pesos, 505 U.S. at 769. "In determining whether a mark has obtained secondary meaning, courts consider: (1) whether actual purchasers of the product bearing the mark associate the mark with the producer; (2) the degree and manner of advertising under the mark; (3) the length and manner of use of the mark; and (4) whether use of the mark has been exclusive." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 991 (9th Cir. 2006). Whether a mark has acquired secondary meaning generally presents a question of

fact. Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 930 (9th Cir. 2005). As such, to survive summary judgment, a plaintiff is "required to come forward with enough evidence of secondary meaning to establish a genuine dispute of fact." Japan Telecom, 287 F.3d at 873, 875 (affirming summary judgment for defendant where plaintiff's evidence was insufficient to show secondary meaning).

### a) Presumption of Secondary Meaning

Plaintiff first argues that it is entitled to a presumption of secondary meaning under section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f). That section states, in relevant part, as follows: "The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially *exclusive and continuous* use thereof as a mark by the applicant in commerce for the *five years* before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f) (emphasis added). Here, Plaintiff asserts that the presumption applies here because it allegedly has been using the "Sand Hill Advisors" mark exclusively and continuously since March 29, 1995, and that Defendant did not begin using the mark until 2005, which more than five years after Plaintiff's date of first use. (Opp'n at 16.)

Neither party discusses the threshold question of whether section 2(f) is germane in an infringement case where the mark is *unregistered*. Stated simply, it is not. As noted, a *descriptive* mark cannot be registered with the PTO absent a showing of secondary meaning. Two Pesos, 505 U.S. at 769. An applicant nevertheless may seek to register a descriptive mark pursuant to section 2(f), which creates a presumption of distinctiveness (or "acquired distinctiveness"), where the applicant can establish at least five years of substantially exclusive and continuous use. See Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 393 (2d Cir. 1995). If the PTO approves the registration under section 2(f), the presumption of validity conferred by the registration *also* "includes a presumption that the registered mark has acquired distinctiveness[.]" Cold War Museum, Inc. v. Cold War Air Museum, Inc., 586 F.3d 1352, 1356 (Fed. Cir. 2009). Thus, in a federal infringement action, the holder of the registered mark may rely on section 2(f) to show acquired distinctiveness (i.e., secondary meaning) *as of the*

*date of registration.* See Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 870 (8th Cir. 1994) (plaintiff could not rely on presumption of secondary meaning where it alleged that defendant infringed in 1985, but the mark was not registered until 1988); 2 McCarthy § 11:13 ("The presumption to which a § 2(f) registration is entitled is not that the designation is inherently distinctive, but that it had acquired secondary meaning *as of the date of registration*.") (emphasis added). In the instant case, the "Sand Hill Mark" was never registered by Plaintiff, and as such, no presumption of secondary use could have arisen, even if Plaintiff now could show retrospectively that it meets the requirements of section 2(f). See Aromatique, 28 F.3d at 870.

Even if section 2(f) were applicable, Plaintiff has failed to demonstrate the requisite five years of exclusive and continuous use. Assuming without deciding that Plaintiff's date of first use was March 25, 1995, Defendant has presented uncontroverted evidence demonstrating that it used the "Sand Hill Advisors" mark within five years of that date. Prior to March 25, 2000, Defendant was registered with the California Secretary of State under the "Sand Hill Advisors" mark, which it began using shortly thereafter. The record confirms that within five years of Plaintiff alleged date of first use, Defendant used the "Sand Hill Advisors" mark on its letterhead, and transacted business and publicized itself in newspapers and other media under that name. (Davidson Reply Decl. Ex. C.)

Plaintiff responds that in order to challenge its showing of a "substantially continuous" use of the "Sand Hill Advisors" mark, Defendant is required to show that it used the mark in advertising or in a manner that describes its services. (Opp'n at 16-17.) Relying on that standard, Plaintiff takes the position that Defendant did not begin using the "Sand Hill Advisors" mark *in commerce* until 2005, when started using the mark in connection with its website and on banners and flyers. (Opp'n at 17.) However, neither of cases cited by Plaintiff supports that proposition. In re Supply Guys, Inc., 86 U.S.P.Q.2d 1488, 1495 (T.T.A.B. 2008) involved an appeal from the denial of a trademark registration, while Modular Cinemas of America, Inc. v. Mini Cinemas Corp., 348 F. Supp. 578, 581-82 (S.D.N.Y. 1972) addressed the

issue of "use" to determine which party could establish priority to claim ownership of the mark. Notably, section 2(f) was neither addressed nor at issue in either case.

In sum, the undisputed evidence establishes that Defendant was using the "Sand Hill Advisors" mark within five years of Plaintiff claimed dated of first use. As such, even if section 2(f) could be applied to unregistered marks, the record demonstrates that Plaintiff cannot demonstrate the requisite five years of substantially exclusive and continuous use.

### b) Evidence of Secondary Meaning

Because "Sand Hill Advisors" is descriptive, it is not entitled to protection unless it has acquired secondary meaning. "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." Art Attacks Ink, LLC v. MGA Entm't Inc., 581 F.3d 1138, 1145 (9th Cir. 2009) (internal quotation marks and citation omitted, emphasis added). "An expert survey of purchasers can provide the most persuasive evidence of secondary meaning." Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989); Grupo Gigante SA De CV v. Dallo & Co., Inc., 391 F.3d 1088, 1107 n.1 (9th Cir. 2004).

Plaintiff admittedly has no expert survey to support its claim of secondary meaning, but instead, relies entirely on evidence that it used the "Sand Hill Advisors" mark in its marketing and advertising efforts. In certain cases, "[e]vidence of use and advertising over a substantial period of time is enough to establish secondary meaning." Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc., 870 F.2d 512, 517 (9th Cir. 1989). However, evidence of secondary meaning must be established as of the time that the alleged infringer began using the mark in dispute. See Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir. 1985) ("[Levi] Strauss was required to prove that the tab as used on shirts had acquired secondary meaning by 1976, when Blue Bell began using a protruding label on shirts."). Consequently, only evidence showing use of the mark in advertising prior to Defendant's use of the mark is probative of secondary meaning.

Here, Plaintiff asserts that its evidence shows that since it changed its name in 1995 to "Sand Hill Advisors," it has advertised the mark through a variety of channels. These marketing and promotion efforts have included sending out newsletters, attending conferences, providing commentary on radio and television programs, preparing white papers (i.e., reports), underwriting community and charity events, participating in non-profit boards, maintaining an active website and attending professional events. (E.g., Williams Decl. ¶¶ 16-20 and Exs. E, F, H, K, L; Williams Depo. at 47:2-73:8; Creighton Depo. at 111:25-112:11 149:3-151:7.) But, advertising, standing alone, does not establish secondary meaning. "The 'true test of secondary meaning' is the effectiveness of the advertising effort." Art Attacks Ink, LLC, 581 F.3d at 1146 (affirming summary judgment for alleged infringer where plaintiff failed to produce any evidence to demonstrate that its advertising was effective). Here, Plaintiff has adduced no evidence to show that its advertising and marketing efforts were effective. Having failed to show secondary meaning, Plaintiff cannot establish that it possesses a protectable mark, which is an essential element of its claim for service mark infringement. Defendant is therefore entitled to summary judgment on this basis.

### B. LIKELIHOOD OF CONFUSION

Defendant next argues that even if Plaintiff could demonstrate that it has a protectable mark, Plaintiff cannot show that Defendant's use of the identical mark is likely to cause consumer confusion. The Ninth Circuit has established eight factors that are relevant to this determination: (1) the strength of the plaintiff's mark; (2) proximity of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods or services and the degree of care likely to be used by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 448-49 (9th Cir. 1979).

The similarity of the marks, proximity of the goods or service and marketing channels used constitute "the controlling troika in the Sleekcraft analysis," GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000), and are considered the most important, see Brookfield Commc'ns, Inc. v. W. Coast Entm't. Corp., 174 F.3d 1036, 1055 n.16 (9th Cir.

1999). "Some factors are much more helpful than others, and the relative importance of each individual factor will be case specific . . . . [I]t is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 901 (9th Cir. 2002). Where no "rational trier of fact" could find that a likelihood of confusion is "probable," the Court may grant summary judgment for the party accused of infringement. M2 Software, Inc. v. Madacy, 421 F.3d 1073, 1085 (9th Cir. 2005).

### 1. Strength of the Mark

The Court has concluded above that "Sand Hill Advisors" is primarily geographically descriptive, which supports the conclusion that the mark is weak. See Grupo Gigante SA De CV v. Dallo & Co., Inc., 391 F.3d 1088, 1102 (9th Cir. 2004) ("Descriptive or suggestive marks are relatively weak."). In addition, the widespread use of "Sand Hill" by other businesses further weakens the "Sand Hill Advisors" mark. See One Indus., LLC v. Jim O'Neal Distrib., Inc., 578 F.3d 1154, 1164 (9th Cir. 2009) ("When similar marks permeate the marketplace, the strength of the mark decreases."); Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2002) (internal quotation marks and citation omitted). Other business, many of which are located in the Silicon Valley (which encompasses the Sand Hill area), include "Sand Hill Angels," "Sand Hill Financial," "Sand Hill Finance," "Sand Hill Capital," "Sand Hill Econometrics," "Sand Hill Equity Research," "Sand Hill Partners," "Sand Hill Consulting Associates," and "Sand Hill Group LLC." (Davidson Decl. Ex. K.) Where the market is inundated by products using the particular trademarked word, there is a corresponding likelihood that consumers "will not likely be confused by any two in the crowd." Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002).

Plaintiff argues that this factor is germane only where the marks are different, and inapposite in cases such as the present where the marks are identical. (Opp'n at 22-23.) As support for this proposition, Plaintiff cites this Court's decision in Instant Media, Inc. v. Microsoft Corp., 2007 WL 2318948 at *13 (N.D. Cal. Aug. 13, 2007). In that case, plaintiff Instant Media alleged that its trademark "I'M" was infringed by defendant Microsoft's use of

the mark "i'm."  The Court found that Instant Media's mark was "conceptually weak because the I'M mark exists in a crowded field of trademarks using variations of 'IM,' 'I'm' and 'I am.'"  Id. at *13.  Despite Defendant's intimation to the contrary, the Court did not conclude that a mark is weakened by common use of terms comprising the mark only where the marks are identical.  The Court concludes that Plaintiff's mark is weak and that this factor weighs in favor of Defendant.

### 2. Relatedness of Services

The next factor concerns the proximity or relatedness of the good or services represented by the potentially infringing mark.  See Sleekcraft, 599 F.2d at 348-49.  Related services are generally more likely than unrelated services to confuse the public as to the provider of the services.  Brookfield, 174 F.3d at 1055.  Here, the services offered by Plaintiff and Defendant are fundamentally distinct.  Plaintiff is a wealth management firm that provides advice to its wealthy clients to assist them in the management of their assets; to that end, provides advice on investment planning, retirement and estate planning and philanthropic strategies.  (Williams Decl. ¶ 10; Davidson Decl. Ex. L.)  In contrast, Defendant merely purchases, owns, sells, manages and leases commercial properties *for its own account*.  (Hill Decl. ¶ 4.)  Unlike Plaintiff, Defendant does not provide any advice to any third party, and has no involvement in providing wealth management services.  (Id.)

Plaintiff argues that its provision of real estate investment advice overlaps with Defendant's business.  (Opp'n at 19.)  This contention lacks merit.  It is undisputed that Defendant offers no advice concerning investing in real estate to any third parties.  (Hill Decl. ¶¶ 3-5.)  Nor is it disputed that Plaintiff does not engage in the sale, purchase or lease of any commercial properties.  (McCaffrey Depo. at 50:10-52:14.)  Indeed, Mr. Conway admitted that Defendant is not a competitor of Plaintiff.  (Conway Depo. at 89:9-12.)  The most favorable inference that may be drawn from the record regarding the similarities in the parties' services is that both, in a broad sense, have some connection to "real estate."  "However, such a broad inference is not sufficient to demonstrate that a genuine issue exists concerning likelihood of confusion as to the source of the products involved in the present suit."  Astra Pharm. Prods.,

Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1206 (1st Cir. 1983) (holding that the fact that plaintiff and defendant's respective products were used in the medical or health care field was insufficient to show that the goods were sufficiently similar to cause a likelihood of confusion). The Court concludes that the services are unrelated, and this factor weighs in favor of the Defendant.

### 3. Similarity of the Marks

The greater the similarity between the two marks at issue, the greater the likelihood of confusion. Entrepreneur Media, 279 F.3d at 1144. The marks here are identical, which, at first blush, appears to favor Plaintiff. However, the likelihood of confusion is obviated where, as here, the services are unrelated and the parties operate in distinct markets with no overlap in customers. See Brookfield Commc'ns, 174 F.3d at 1056 (likelihood of confusion resulting from the use of the same or similar mark was "remote" if the parties "did not compete" with one another); Dynamics Research Corp. v. Langenau Mfg. Co., 704 F.2d 1575, 1577 (Fed. Cir. 1983) (common use of "DRC" mark not likely to cause confusion where products were "quite distinct"). Thus, despite the fact that the marks at issue are identical, the Court finds that the undisputed fact that the parties operate in different markets involving distinct consumers and are not competitors renders this factor, at best, neutral.

### 4. Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." Sleekcraft, 599 F.2d at 353. Plaintiff argues that both parties: (1) operate websites to describe their services; (2) utilize promotional brochures; (3) rely on "word of mouth" referrals; (4) attend networking events; and (5) promote their marks on banners. (Opp'n at 22.) Plaintiff's argument is unpersuasive. While both parties operate websites, Plaintiff has admitted that no one viewing Defendant's website would confuse it with Plaintiff's site. (McCaffrey Depo. at 207:11-19.) The common use of an advertising medium (i.e., brochures and banners) is not probative of whether they are disseminated to the same audience. In fact, Plaintiff readily acknowledges that Defendant places its banners on buildings while Plaintiff uses them at sponsored events. (Opp'n at 22.) Plaintiff also has made no showing that Plaintiff and Defendant attend the same

networking events or that their "word-of-mouth" referrals involve the same demographic. The Court is persuaded by the record presented that any overlap in the parties' marketing channels is nil or minimal, which weighs in favor of Defendant.

### 5. Degree of Care

The likelihood of consumer confusion decreases where the consumer is sophisticated and exercises a high degree of care. See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457 F.3d 1062, 1076 (9th Cir. 2006). This is particularly true where the good or service is expensive. Id. Defendant contends that Plaintiff's clients and those individuals likely to do business with Defendant are sophisticated, and hence, are unlikely to be confused. (Mot. at 22.) Plaintiff concedes as much, but argues such sophistication is irrelevant on the ground that its clients would not retain Plaintiff if they believed that it was focused on real estate management. (Opp'n at 25.) Aside from being devoid of evidentiary support, Plaintiff's argument misses the point. This factor is not centered on a prospective customer or client's purchase decision, but rather, whether he or she is sufficiently sophisticated to discern the difference between the parties, notwithstanding their use of an identical or confusingly similar mark. Given Plaintiff's concession that the parties' customers are sophisticated and are unlikely to confuse the two companies, the Court finds that this factor weighs in favor of Defendant.

### 6. Evidence of Actual Confusion

Evidence that use of a mark or name has already caused actual confusion as to the source of a product or service is "persuasive proof that future confusion is likely." Sleekcraft, 599 F.2d at 352; Playboy Enters., Inc. v. Netscape Commc'ns, 354 F.3d 1020, 1026 (9th Cir. 2004) ("actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion[.]"). Here, there is scant evidence of actual confusion, which weighs in favor of Defendant. The record shows that over the course of the last ten years since Defendant began using the "Sand Hill Advisors" name, it has received only five or six telephone calls and one package intended for Plaintiff. (Hill Decl. ¶ 13.) There also is no

evidence that anyone has confused Plaintiff with Defendant.  In view of the dearth of evidence of actual confusion, the Court finds that this factor weighs in favor of Defendant.

### 7. Defendant's Intent

"While an intent to confuse consumers is not required for a finding of trademark infringement, intent to deceive is strong evidence of a likelihood of confusion."  Entrepreneur Media, 279 F.3d at 1148.  Plaintiff admittedly has no direct evidence of Defendant's intent to deceive, but instead claims that such intent can be inferred on the ground that Mr. Hill denied knowing about Plaintiff's existence at the time he registered Defendant as a limited liability company in 1999.  (Opp'n at 23.)  At his deposition, Mr. Hill testified that he made an effort to determine whether the domain name www.sandhilladvisors.com was available, but denied using an internet search engine such as Google to ascertain whether another company already was using the name "Sand Hill Advisors."  (Hill Depo. at 68:25-69:25; 79:1-12.)  Plaintiff surmises that Mr. Hill was not being truthful and posits that he must have known about Plaintiff when he was securing Defendant's domain name.  This argument is based on nothing but sheer speculation, which is not evidence.  See McSherry v. City of Long Beach, 584 F.3d 1129, 1138 (9th Cir. 2009) ("Summary judgment requires facts, not simply unsupported denials or rank speculation").  The Court thus finds that this factor favors Defendant.

### 8. Likelihood of Expansion

"A strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing."  Sleekcraft, 599 F.2d at 354.  Plaintiff does not address, let alone dispute, Defendant's contention that neither party has evinced any intention to expand its business into the other's market.  Accordingly, this factor weighs in favor of Defendant.

### 9. Summary

All but one of the Sleekcraft factors strongly favor Defendant, and none favor Plaintiff.  Although Plaintiff and Defendant share the same mark, they offer completely distinct services to distinct consumers in separate markets.  Plaintiff's assertion that the parties overlap in the area of real estate services paints with too broad a brush.  The record unequivocally establishes

that Plaintiff and Defendant's respective businesses share little, if anything, in common. The lack of overlap is underscored by the paucity of evidence of actual confusion, which consists of nothing more than a few misplaced calls and a misdelivered package over the course of the last ten years. Viewing the record in a light most favorable to Plaintiff, the Court finds that no reasonable jury could find that the parties' common use of the "Sand Hill Mark" is sufficient to create a likelihood of confusion.

## IV. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment (Docket 36) is GRANTED.

IT IS SO ORDERED.

Dated: January 26, 2010

                                               SAUNDRA BROWN ARMSTRONG
                                               United States District Judge